In re HO-TAH-MOIE'S ESTATE. WAGOSHE v. MORRELL et al.

No. 30913.　March 2, 1948.

Rehearing Denied June 29, 1948.
Second Petition for Rehearing Denied Sept. 28, 1948.

*198 P. 2d 638.*

L. R. Stith, of Fairfax, and Tillman & Tillman and Hamilton & Kane, all of Pawhuska, for plaintiff in error.

Chas. R. Gray, W. N. Palmer, and MacDonald & Files, all of Pawhuska, Frank Mahan, of Fairfax, and G. K. Sutherland, and T. F. Dukes, both of Hominy, for defendants in error Robert Morrell et al.

P. D. Lindsey, of Hominy, for defendant in error Joe Shun-kah-mo-lah.

Johnson & Johnson, of Fairfax, for defendants in error heirs and devisees of Peter Kenworthy, deceased.

H. P. White, of Pawhuska, for Sallie Allen, cross-petitioner and cross-plaintiff in error.

GIBSON, J. This is a proceeding to determine heirship as incident to final distribution of a decedent's estate. 58 O. S. 1941 §631.

The matter originated in the county court of Osage county, where it was determined that John Wagoshe, plaintiff in error here, was the first cousin of Ho-tah-moie, Osage allottee No. 350, deceased, and was the next of kin and the sole and only heir of the deceased under the Oklahoma laws of succession.

An appeal was taken to the district court of Osage county and that court determined that John Wagoshe, a group known as the Morrells and Joe Shun-ka-mo-lah, were related to Ho-tah-moie, deceased, in the same degree, were the next of kin of the deceased and inherited equal parts of his estate.

This judgment also found that certain other claimants, designated as the heirs of Peter Kenworthy, and one Sallie Allen, claiming to be the legitimate daughter of the deceased, were not heirs of the deceased.

The case is here on appeal by John Wagoshe and other parties hereinafter mentioned on cross-appeal from the judgment of the district court of Osage county.

Appellant claims to be the first cousin of deceased and closest of kin and therefore entitled to inherit his entire estate. It is claimed by appellees and cross-appellants, Robert Morrell, Nellie Morrell Roubideaux, Mary Morrell Russell, Mary Morrell Beartrack, Maggie Morrell Burkhart, John Morrell and Mary Agnes Lohowa, that they, together with Joe Shun-kah-mo-lah, are second cousins of deceased and closest of kin and therefore his only heirs; they also claim that if appellant, John Wagoshe,

is related to deceased it is in a degree more remote than that of second cousin. Joe Shun-kah-mo-lah, who also cross-appealed, claims to be a nephew of deceased and closest of kin and therefore entitled to inherit his entire estate. The heirs of Peter Kenworthy have also cross-appealed and claim that Kenworthy died subsequent to the death of Ho-tah-moie; that he is a second cousin of deceased and nearest of kin and is therefore the only heir. It is their contention that appellant is not related to deceased and that claimants in the Morrell group and Joe Shun-kah-mo-lah are related to deceased as third cousins instead of as claimed by them, and that Peter Kenworthy was therefore more closely related to deceased than either Joe Shun-kah-mo-lah or any other claimant in the Morrell group. Sallie Allen has also cross-appealed and claims to be a daughter of deceased and therefore his sole and only heir.

The trial court found:

"That at the time of Ho-tah-moie's death he left surviving him as his sole and only heirs at law, John Wagoshe, Joe Shun-kah-mo-lah, Robert Morrell, Nellie Morrell Roubideaux, Mary Morrel Russell, Mary Agnes Lohowa, Mary Morrell Beartrack, Maggie Morrell Burkhart and Johnnie Morrell, and that each and all of said above named heirs at law were related to the deceased Ho-tah-moie in the same degree of kindred, and that no other person or claimant is or was as closely related to the said Ho-tah-moie at the time of his death as the above named heirs at law; and that no other claimant has any right, title, or interest in or to the estate of said decedent, or any part thereof."

Appellant in support of his contention that he is first cousin of Ho-tah-moie introduced evidence tending to establish the following facts: Ho-tah-moie died intestate, was never married; that he had a brother and two sisters all of whom pre-deceased him; that he left surviving him no father, no mother or sister or brother; that his mother and Ho-tah-moie's mother were sisters; that his mother's name

was Ma-tsa-he; that the mother of Ho-tah-moie was Mah-sah-hah-e; that Ne-kah-lah-bre or Ne-ah-ble, otherwise known as O-pah-tun-kah, English name Big Elk, was the father of Mah-sah-hah-e and Me-tsa-he, and therefore the grandfather of appellant Wagoshe and deceased, Ho-tah-moie.

The register of Osage Indian families based on the December 1901 Annuity Osage Indian Payment Rolls shows that Ne-ah-ble, also known as Ne-kah-lah-bre, also known as O-pah-tun-kah, is the father of Mah-sah-hah-e and Me-tsa-he and Me-tsa-he is the mother of appellant.

There is also offered in evidence a transcript of the testimony of Wilson Kirk taken at a hearing in the county court of Osage county in the guardianship matter of Ho-tah-moie on the 22nd day of June, 1931, in which the witness testified that Ho-tah-moie was never married; that he had two sisters and a brother, all of whom were dead leaving no issue; that the mother of appellant Wagoshe was Me-tsa-he; that Mah-sah-hah-e was the mother of Ho-tah-moie and that Me-tsa-he and Mah-sah-hah-e were sisters and had the same father.

George Stabler, an Omaha Indian who also speaks and understands the Osage Indian language, testified that Ho-tah-moie referred to appellant Wagoshe as brother and also said that Ho-tah-moie spoke of his grandfather on his mother's side and gave his name as O-pah-tun-kah. It is also shown in the evidence that it is the Osage Indian custom to refer to and call first cousins "brother". Other witnesses also testified that Me-tsa-he had declared to them that she and Mah-sah-hah-e were sisters. Other witnesses, eight in number, testified that close relatives of the family had stated in their presence that appellant Wagoshe was the son of Me-tsa-he and that she and Mah-sah-hah-e were sisters.

Appellant Wagoshe testified that Ne-kah-lah-bre, also called O-pah-tun-kah,

was his grandfather; that Mah-sah-hah-e was the mother of Ho-tah-moie and a sister of his (appellant's) mother Me-tsa-he; that Ne-kah-lah-bre was the father of Mah-sah-hah-e and that Me-kah-he was her mother; that Ne-kah-lah-bre was also the father of his mother Me-tsa-he and that E-ne-shop-sha was her mother.

Appellees contend that Po-e-nah and not Ne-kah-lah-bre was the father of Me-tsa-he. In support of this contention they rely almost exclusively on the January 1878 Indian Payment Roll. This roll shows Che-shu-hun-kah head of family, Hun-kah-we wife, Me-tsa-he wife, Po-e-nah father-in-law, Num-pah-se son. The evidence shows that Num-pah-se is the Indian name of appellant Wagoshe. It is asserted that since this roll shows Che-shu-hun-kah to be the son-in-law of Po-e-nah therefore Po-e-nah must have been the father of Me-tsa-he, and that such evidence conclusively disproves the contention of appellant that his mother and Hotah-moie's mother were sisters. This, however, is the only payment roll upon which Po-e-nah appears as the father-in-law of Che-shu-hun-kah. On the August and June 1879 rolls the name of Po-e-nah as father-in-law does not appear. The fact that Po-e-nah's name so appears on the above roll is not sufficient to overcome the positive testimony of Wagoshe and numerous other witnesses and the Indian Payment Roll of 1901 that Ne-kah-ah-ble, otherwise known as Ne-kah-lah-bre, was the father of both Man-sah-hah-e and Me-tsa-he. It is asserted that the evidence of Wagoshe and other witnesses offered by appellants is so conflicting or contradictory as to be valueless and therefore without probative force and should be entirely disregarded. While it is true that the evidence in some respects appears to be somewhat conflicting as to these witnesses, the same is true as to many of the witnesses testifying on behalf of appellees. This apparent contradiction or conflict is in a large degree due to a mis-

understanding of the questions propounded and their testimony after the question was fully understood was corrected. Appellees specially refer to an affidavit made by Wagoshe in a hearing before the Interior Department to determine heirship of his deceased mother, Me-tsa-he, in which he made the following statement:

"That to the best of the knowledge and belief of the affiant decedent had no brother or sisters; that she was the only child of Ne-kah-ah-bre and E-ne-shop-sha."

Wakoshe, however, testified that in making the affidavit he only intended to say that she had no brothers or sisters living. Accepting this explanation the affidavit in no manner contradicts his testimony relative to the relationship existing between his mother and Ho-tah-moie's mother.

Appellees further assert that there is such great difference between the ages of Mah-sah-hah-e and Me-tsa-he as to make it impossible for them to have been sisters. In support of this contention they refer to the January 17, 1880, Indian Payment Roll showing Me-tsa-he to be 31 years of age and the same payment roll showing Mah-sah-hah-e to be 52 years of age, or a difference of 21 years in their ages. The record, however, discloses that the rolls vary considerably as to ages of the same persons. It will be seen in the January 1880 Payment Roll Me-tsa-he's age is given as 31 years; Ma-sha-ke-tah's, half brother of Num-pah-se, age is given as 10 years, and Moh-shon-tsa-e-tah's age is given as 7 years; and that on the December 14, 1880, Payment Roll Me-tsa-he's age is given as 34 years or raised 3 years; Nun-pah-se's age is reduced from 8 years to 7 years; Na-sha-ke-tah's age is reduced from 10 to 9 years and that Mo-shon-tsa-e-tah's age is reduced from 7 to 5 years. The 1878 Payment Roll shows the age of Lah-hu-in-kah, husband of Mah-sah-hah-e to be 80 years, and the December 13, 1880, Payment Roll made two years later shows him to be 60 years of age,

a reduction of 20 years. It will thus be seen that the rolls relative to age are not infallible. Accepting, however, the rolls correct as to the ages of Me-tsa-he and Mah-sah-hah-e, there would then be a difference of 18 years in their ages. The difference in their ages is therefore not so great as to make it impossible for them to have had the same father.

The evidence shows that Na-kah-lah-bre first married Ma-kah-he and that they were the parents of Mah-sah-hah-e and that later Ne-kah-lah-bre married E-ne-shop-sha and that they were the parents of Ma-tsa-he. The age of E-ne-shop-sha at the time she married is not shown nor is the lapse of time between the death of Me-kah-he and the marriage of Ne-kah-lah-bre and E-ne-shop-sha shown. In these circumstances there might have been considerable difference between the ages of Me-tsa-he and Mah-sah-hah-e. The circumstance of the difference in their ages is not sufficient to show that they are not sisters.

It is contended by counsel for Joe Shun-kah-mo-lah that he is a nephew of Ho-tah-moie, the nearest of kin and sole heir. In support of this contention it is asserted that Lah-hu-in-kah, the father of Ho-tah-moie, was also the father of Shon-kah-mo-lah; that Lah-hu-in-kah first married Mah-sah-hah-e; that Ho-tah-moie was born of that union and he thereafter married Wah-sha-she-me-tsa-he; that Shon-kah-mo-lah was born of that union and that he and Ho-tah-moie are therefore half brothers; that Joe Shun-kah-mo-lah is the son of Shon-kah-mo-lah and a nephew of Ho-tah-moie. The only evidence offered in support of this contention consists of a pedigree and reputation evidence. Numerous witnesses, fourteen in number, testified as to such pedigree and reputations. Some of these witnesses testified that Ho-tah-moie, and others closely related to Ho-tah-moie, declared that Shon-kah-mo-lah and Ho-tah-moie were brothers. Other witnesses testified that persons closely related to the family had de-

clared that Shon-kah-mo-lah and Ho-tah-moie were brothers. The 1879 Indian Payment Roll shows Wah-sha-she-me-tsa-he to be the mother of Shon-kah-mo-lah. The Payment Roll of the same year shows Lah-hu-in-kah to be the husband of Mah-sah-hah-e and Ho-tah-moie to be their son. No Indian Roll has been introduced in evidence showing Lah-hu-in-kah to be the father of Shon-kah-mo-lah, nor does the record disclose any direct evidence tending to show that Lah-hu-in-kah and Wah-sha-she-me-tsa-he were ever united in marriage by Indian custom marriage or otherwise. Joe Shun-kah-mo-lah testified that he claims relationship to Ho-tah-moie through his grandmother whose name was Wah-sha-she-me-tsa-he, and that he was a cousin to Ho-tah-moie but did not know whether he was a first, second or third cousin, and further testified that he did not know what relation Lah-hu-in-kah was to Ho-tah-moie and did not know whether his grandmother was a sister of Lah-hu-in-kah and that he was never told and did not know who his mother was. It is also shown that at the hearing in the county court he testified that Ho-tah-moie and his father were first cousins. The weight of the evidence shows that Joe Shun-kah-mo-lah bears no closer relationship to Ho-tah-moie than that of second cousin.

It is contended by the Morrell group that they and Joe Shun-kah-mo-lah are second cousins to deceased and his sole heirs. The evidence in their behalf shows that Lah-hu-in-kah, father of Ho-tah-moie, was a brother of Wah-sha-she-me-tsa-he, grandmother of these appellees; that Wah-sha-she-me-tsa-he was the mother of O-lo-hah-moie, Hlu-ah-wah-tah, Shon-kah-molah and Wah-she-kah-me. That appellees Robert Morrell, Nellie Morrell Roubideaux and Mary Morrell Russell are children of O-lo-hah-moie; that Maggie Morrell Burkhart, Mary Morrell Beartrack and John Morrell are children of Hlu-ah-wah-tah; that appellee Joe Shun-kah-mo-lah is the son of Shon-kah-mo-lah and that appellee Mary Agnes Lohowa is the daughter of Wah-sha-kah-me. There is no serious conflict in the evidence as to the relationship of the above-named appellees and establishes that they are second cousins of deceased.

Sallie Allen in support of her claim that she is the daughter of Ho-tah-moie in substance testified that her mother and aunts and other relatives advised and told her that Ho-tah-moie was her father; that Ho-tah-moie and her mother were married by common law or Indian custom marriage and that they lived together as husband and wife for about one year; that her mother's name was Louise Jacobs, an Euchee Indian, a branch of the Creek Tribe; that her Aunt "Snooky" and Ho-tah-moie were present when she was born; that after she grew up Ho-tah-moie recognized her and treated her as his daughter; that she called him daddy and that he called her baby; that she frequently came to Pawhuska to visit her daddy. In this statement she is corroborated by six witnesses who testified that they had seen Sallie Allen visit Ho-tah-moie numerous times at Pawhuska. Several other witnesses also testified that David Hodge, father of Elam Hodge, and who appellant and other claimants contend is the father of Sallie Allen, and his wife Snooky had, on different occasions, said in their presence that Osage John Stink was the father of Sallie Allen. Several other witnesses testified that Ho-tah-moie told them that he had a wife and daughter. She also offered in evidence the following note purported to have been written by John Stink, nick name of Ho-tah-moie:

"Pawhuska, Okla. 11 of September, 1909.

"John Stink I want everythin I own my head rites everything to go to Sallie Clarisie Hodg pleas.

John Stink

"I think it my child. My Gadean be your gadean."

Sallie Allen testified that Ho-tah-moie first showed her this document in 1909 but did not deliver it to her until 1930; that he at that time stated to her that upon his death he wanted to leave to her all his property and that she should transmit the document to the Osage Indian Agency; that he stated this to her in English. The evidence of those who were best acquainted with Ho-tah-moie, however, testified that Ho-tah-moie could not and did not speak English.

Counsel on cross-examination sought to show that the document purported to have been signed by John Stink was recently written and probably written after the death of Ho-tah-moie, but no direct evidence was produced to establish such fact. The evidence shows that the document was printed in lead pencil on a sheet of tablet paper. Counsel in their brief state that the document had every appearance of having been recently written and showed no signs of age or wear. This document was before the trial court. He had an opportunity to inspect and examine the instrument and was therefore in a better position to judge its authenticity and probative value than are we.

Sallie Allen also offered in evidence photographs in two different poses of herself and Ho-tah-moie. These photographs show some resemblance between Ho-tah-moie and herself. The photographs, however, show that Sallie Allen at the time her picture was taken was dressed in a similar manner to that in which Ho-tah-moie was dressed at the time his picture was taken. The photographer who took the pictures testified that prior to taking the pictures of Sallie Allen she had her dress as near as possible as was Ho-tah-moie at the time his picture was taken in order to make the comparison complete. The apparent resemblance between Sallie Allen and Ho-tah-moie as shown by these pictures is based primarily upon this make-up. Sallie Allen was present in court and testified. The trial court had an opportunity to see and observe her face and features while so testifying and was in a better position and more able to judge as to the resemblance, if any, between her and Ho-tah-moie than are we from the photographs. Sallie Allen, however, in her application for old age assistance dated June 14, 1933, gave the full name of her father as Elam Hodge, full name of her mother Louise Hodge.

Appellant offered evidence tending to establish the following fact: Minnie L. Hodge, whose husband was John M. Hodge and a nephew of Elam Hodge, testified that she on different occasions heard Sallie Allen call Elam Hodge daddy and that she heard other members of the Hodge family state that Sallie Allen was the daughter of Elam Hodge. Ethel M. Hodge also so testified. Mrs. Orcutt, who was then 73 years of age, testified that she was born in 1867; that her father was Alvin Hodge, who was a brother of Elam Hodge; that she knew Sallie Allen and was acquainted with her for a number of years; that she knew when and where Sallie Allen was born; that she was born not far from Pole Cat; that she knew this of her own knowledge; that her mother waited upon Sallie Allen's mother when she was born; that she always called Elam Hodge her father. It is also shown that Sallie Allen at the present hearing in the district court testified that she was born May 10, 1878. In her application for old age assistance she states that she was born May 10, 1874, and in her Bible she made a note stating that she was born May 10, 1874, and was married to W. R. Allen in 1892. In numerous other instruments signed by her she states she was born May 10, 1874. The Osage Payment Roll of January 2, 1878, gives Ho-tah-moie's age at 10 years. If Sallie Allen was born May 10, 1878, as testified by her, Ho-tah-moie then according to this roll could not have been older than 10 years at the time she was born. If she was born as early as May 10, 1874, which date she gives numerous times as the date of her birth, Ho-tah-moie would

then only have been 6 years of age at the time she was born.

Sallie Allen has offered evidence, however, tending to show that the age of Ho-tah-moie as given on the January 23, 1878, Payment Roll, is incorrect. B. F. Mayes testified that an Osage woman named Aunt Deloris, who used to live with the Ho-tah-moie family, stated that Ho-tah-moie came with the Osage Indians from the State of Kansas to the Indian Territory in 1872 and that Ho-tah-moie was then 13, 14 15 or 16 years old.

Joe Duncan testified in the county court in April, 1940, that he had known Ho-tah-moie for 49 years and that Ho-tah-moie was 35 or 40 years of age. It was stipulated that he would also so testify if he were present at the hearing in the district court.

Charles Blair testified that he had known Ho-tah-moie for some time; that he knew him as early as 1889; that he was then 35 or 40 years old.

The trial court, after reviewing all the evidence, came to the conclusion that Sallie Allen was not the daughter of Ho-tah-moie.

The Peter Kenworthy heirs claim to be second cousins and nearest of kin of deceased, Ho-tah-moie. They assert that appellant John Wagoshe is not related in any degree and that Joe Shun-kah-mo-lah and the Morrell group, if related at all, are related in a degree more remote than that of second cousins, and they also contend that Sallie Allen is not a daughter of deceased.

It is their contention that Peter Kenworthy's grandfather on his mother's side was Lah-hu-in-kah's brother. In support of this contention they offered the oral evidence of several witnesses including that of Wilson Kirk and Eliza Tallchief. The evidence of Mr. Kirk was taken as heretofore stated in the guardianship proceedings of Ho-tah-moie, and was admitted in evidence in behalf of all parties. Mr. Kirk specifically testified in that proceeding

that Peter Kenworthy's grandfather on his mother's side was Lah-hu-in-kah's brother; and Eliza Tallchief testified that she was a daughter of the principal chief of the Osages who executed the allotment deeds on behalf of Osage allottees and she testified that she heard her father and stepmother say that Ho-tah-moie's father and Peter Kenworthy's mother's father were brothers. Several other witnesses testified that Peter Kenworthy was related to Ho-tah-moie without stating the decree of relationship. The Kenworthys offered in evidence records consisting of Osage Payment Rolls or testimony as to the contents thereof which they contend supports their contention as to the relationship existing between Peter Kenworthy and Ho-tah-moie. Their reasoning in this respect is somewhat involved and difficult to follow, and the conclusions drawn by counsel from these records is based largely upon assumption and conjecture.

It is stipulated that an order of court was entered decreeing that Peter Kenworthy, an Osage allottee, died in Osage county after the death of Ho-tah-moie and left surviving him as heirs two daughters and one son, applicant herein, and that Gra-to-me, Osage allottee No. 313, was the mother of Peter Kenworthy and that Peter Kenworthy was the only living descendant of Gra-to-me at the time of the death of Ho-tah-moie. Counsel for the Kenworthys then requested that counsel for other applicant stipulate that Gra-to-me is one and the same person as Gra-to-in-tsa mentioned in the 1878 Payment Roll. Counsel refused to so stipulate. It was evidently the purpose of counsel to obtain this stipulation for the purpose of showing that Gra-to-in-tsa who appeared on the Payment Roll with the Hum-pah-moh-she family was the same person as Gra-to-me in order to connect the family of Hum-pah-moh-she with the family from which Gra-to-me, Kenworthy's mother, came.

The officials in charge of the 1878 Payment Roll testified the roll showed

that Hum-pah-moh-she was then dead, had a widow Mo-se-che-he, age 50, and a daughter Gra-to-in-tsa, age 15, who was a granddaughter of Ka-wah-hre-she. At the bottom of this roll there appears the following note: "The head of this family died about three years ago. Enrolled by mistake. The rest of the family gone with Ke-wah-hre-she, the man who draws the money and receipts." It is contended by counsel for the Kenworthys that this Payment Roll record established the fact that the grandfather of Peter Kenworthy on his mother's side was named Hum-pah-moh-she. This contention, however, is based solely on the assumption that Gra-to-in-tsa mentioned in this payment roll is the same person as Gra-to-me who is conceded was the mother of Peter Kenworthy. There is no direct evidence tending to show that Gra-to-in-tsa is the same person as Gra-to-me. There is evidence in the record which would indicate the contrary. The 1883 Payment Roll was offered in evidence which shows Che-mo-se-sche-he head of family, Gra-to-me daughter, age 16. The 1878 Payment Roll shows Gra-to-in-tsa to be then 15 years of age, which would make her 20 years of age in 1883 or four years older than Gra-to-me. The difference in the names of these parties and their ages is some circumstance tending to indicate that they are two different persons. Counsel for the Kenworthys further contend the evidence shows that the father of Gra-to-me (Gra-to-in-tsa) was a brother of Tsa- moie, and it is asserted that if he was a brother of Tsa-moie he would also be a brother of Lah-hu-in-kah since the evidence shows that Peter Kenworthy's grandfather on his mother's side was a brother of Lah-hu-in-kah. The record, however, fails to disclose any substantial evidence to sustain the contention that Tsa-moie is a brother of Hum-pah-moh-she. In order to sustain this contention the 1883 December Payment Roll, which represents the quarterly payment of Lah-hu-in-kah and Ho-tah-moie which was signed by Tsa-moie, is offered in evidence and there appears attached to this roll an affidavit or certificate executed by J. H. Thompson and F. H. Hensban certifying that Tsa-moie was a brother of Lah-hu-in-kah, and upon this affidavit Tsa-moie drew the quarterly payments of Lah-hu-in-kah and Ho-tah-moie. This affidavit, however, does not establish that Tsa-moie was a brother of Hum-pah-moh-she. If Tsa-moie was a full brother of Lah-hu-in-kah and also a full brother of Hum-pah-moh-she, then these three persons must have had the same father and mother. There is nothing in the record tending to prove such state of facts.

There is also offered in evidence by counsel for the Kenworthys evidence which tends to show that the Hum-pah-moh-she family at no time signed the Indian Payment Rolls but that Tsa-moie signed such rolls from the years 1873 to 1875, at which time it was determined that Hum-pah-moh-she had died. This evidence counsel claims is some circumstance tending to establish the fact that Tsa-moie and Hum-pah-moh-she were brothers. The reasoning of the Kenworthys' counsel in this respect is not convincing, and we fail to see how the conclusion reached by them can be drawn from this evidence. There is no record evidence tending to show any relationship whatever between Peter Kenworthy and deceased, Ho-tah-moie. The only evidence of any probative value in this respect consists of evidence of Wilson Kirk and several other witnesses who testified as to such relationship. There is, however, much evidence to the contrary offered by other claimants. The trial court after considering all the evidence found that Peter Kenworthy was not so related. It cannot be said that this finding is clearly against the weight of the evidence. The trial court also found that Sallie Allen was not a daughter of deceased and that Joe Shun-kah-mo-lah was not his nephew. These findings are supported by the evidence. The trial court further found that appellant Wagoshe, the Morrell

group and Joe Shun-kah-mo-lah were the sole heirs of deceased and that they were related to him in the same degree of kindred without stating the degree. In so far as the court finds that Joe Shun-kah-mo-lah and the Morrell group are related to Ho-tah-moie in the same degree—the evidence shows second cousins—the finding is supported by the evidence, but in so far as it is found that such persons are related to him in the same degree as appellant John Wagoshe it is contrary to all the evidence. Under the evidence appellant John Wagoshe is either a first cousin to deceased or he is an imposter and not related at all. The clear weight of the evidence shows him to be a first cousin.

We conclude, as did the county court, that appellant John Wagoshe is the first cousin of deceased, his nearest of kin and sole heir and entitled to inherit his entire estate.

Our consideration of the evidence in this case and the weight and value thereof is governed by 58 O. S. 1941 §735, that is to say, the appeal is considered upon principles of equitable procedure.

In such case where, upon review of the evidence, it is found that the trial court's judgment is against the clear weight of the evidence, this court will reverse the judgment and render, or cause to be rendered, such judgment and decree as the trial court should have rendered, Harjo v. Johnston, 187 Okla. 561, 104 P. 2d 985; Wallace v. Brooks, 194 Okla. 137, 147 P. 2d 784.

The judgment is reversed and the cause is remanded with directions to the trial court to enter its judgment and decree in accordance with the conclusions and views herein expressed.

HURST, C.J., DAVISON, V.C.J., and BAYLESS, WELCH, CORN, ARNOLD, and LUTTRELL, JJ., concur.