THOMPSON et al. v. TEEL et al.

No. 33782. Dec. 19, 1950.

Rehearing Denied Feb. 6, 1951.

*227 P. 2d 395.*

Houston Bus Hill and Wayne W. Bayless, Oklahoma City, for plaintiffs in error.

Curtis & Blanton, Pauls Valley, and Twyford, Smith & Crowe, Oklahoma City, for defendants in error.

HALLEY, J. This is an action by Lydia Teel, Mary Thigpen, and Thomas F. Harman, to set aside a quitclaim deed executed by them to Laurence

Harman, now Thompson, in December, 1945, and to recover a share of the benefits accruing to grantee and the other defendants by reason of such conveyance. The above-named plaintiffs were three of the five children of B. F. and Lou Harman, deceased, from whom they inherited a 3/5ths interest in 80 acres of land near Elmore City, in Garvin county, Oklahoma. The nine defendants are all children of a deceased son of B. F. and Lou Harman, and inherited together a 1/5th interest in the land, and are the nieces and nephews of the plaintiffs. The remaining 1/5th interest was inherited by the nine children of Kate Harman Farber, a deceased daughter of B. F. and Lou Harman, and is not involved in this action.

B. F. Harman died intestate in 1937, and Lou Harman died intestate in 1942. The defendants had lived near this land as children, and had spent considerable time visiting their grandparents on the farm. Thomas F. Harman and his sister, Mary Thigpen, had lived in Texas, and Lydia Teel in California, for a number of years. Upon the death of Lou Harman in 1942, Thomas F. Harman attended her funeral and, being the oldest child, he went to the farm and advised the then tenant to continue under the same contract existing between him and Lou Harman. He also went to the county judge and inquired about probate proceedings. He was advised that only a resident of Oklahoma could qualify as administrator or administratrix. At that time, only one member of the family, his niece Laurence Harman, lived in Oklahoma. She was a young woman about 24 years of age, and was then teaching school at Sulphur, Oklahoma. He talked to Lee Brewer, the family banker at Elmore City, who agreed to advise and assist Laurence Harman if she were appointed administratrix. When she was first approached on the subject, she declined on the ground that she was inexperienced in business. Upon assurance that she would be assisted by Mr. Brewer, she agreed to serve,

and was appointed on February 11, 1943. She advised the tenant to continue to deposit rentals at Mr. Brewer's bank, and paid the taxes and the interest on an existing mortgage of $500. Upon her discharge on October 30, 1943, she sent checks to all of the heirs for the balance of cash on hand. In the order of distribution some errors appeared in the names of the various heirs. Laurence Harman testified that while acting as administratrix she signed no checks and took no steps with regard to the estate except upon the advice of her attorney and her banker, Mr. Brewer. Mr. Brewer was not advised of the discharge of the administratrix and continued to carry the bank account as before. The tenant continued to deposit the rentals in this account. After her discharge, Laurence Harman advised the tenant to remain on the land and to make the deposits as usual. There is no evidence that she made any agreement with any of the heirs to look after the farm for them, and made no trips to Garvin county thereafter, except in the spring of 1944, when she went to Elmore City to look after a stove that belonged to the Harman estates. She took a position at Taloga, Oklahoma, a considerable distance from Garvin county, where she had not lived since 1938. In 1944, she advised some of the other heirs that a man from Lindsay had offered to buy an oil lease on the farm for $5 an acre. She was ill at the time and unable to meet the prospective purchaser. Thomas F. Harman was notified of this offer, but advised the other heirs that there would be considerable difficulty in making an acceptable title for an oil and gas lease.

In November, 1944, Thomas F. Harman, with Genevieve Adams, a niece living in Texas, went to Pauls Valley to check up on the value of the land and oil and gas activities in that area, and to see about the taxes and the interest on the mortgage. He found that the taxes were delinquent. He called Mr. Brewer, of the bank at Elmore City, and was advised that sufficient

funds were in the bank to pay the taxes, and he advised them to notify his niece, Laurence Harman, and have her write a check for the taxes. Thomas F. Harman discussed the title defects and inquired of Mr. Brewer about oil and gas activities in the area of the farm. At this time, he mentioned the fact that some of the Harman heirs had died and no probate proceedings had been had on their estates. It appears that no probate proceedings were had on the estates of either the deceased brother or the deceased sister, Kate Harman Farber.

Genevieve Adams told Thomas F. Harman that she and her brothers and sisters would like to buy the 3/5ths interest of the plaintiffs in the land and keep title in the family name. He made her a price, which was later approved by his sisters. However, Mrs. Adams notified him in the fall of 1945 that they had bought a home and would be unable to buy the farm land. He stated that his sisters needed money and that he intended to go to Oklahoma City and make an effort to sell their interest in the land. Mrs. Adams told him that Laurence Harman might buy their interest. Shortly thereafter he received a letter from Laurence Harman, advising him that she might want to buy the 3/5ths interest and asking a price. He advised her by letter that they would sell their 3/5ths interest at the same price at which it had been offered to Mrs. Adams, to wit, $750 for the entire interest or $600 for the land, less one-half of the royalty. Laurence Harman accepted this offer in November, 1945, and asked her uncle to have a deed prepared. He had the quitclaim deed, now sought to be canceled, prepared, and it is dated December 13, 1945. It was executed by Thomas F. Harman and his two sisters. He suggested that he would meet Laurence Harman at Pauls Valley to close the deal, but she notified him that she could be absent for only one day at Christmas, and suggested that they meet at the home of her sister, Mrs. Adams, at Holliday,

Texas, where she had planned to have Christmas dinner. They met there on December 25, 1945, and after a brief conversation the deed was delivered.

On March 21, 1946, Laurence Harman executed a deed to her brothers and sisters, the other defendants herein.

On December 13, 1945, Mr. Godfrey, an attorney of Oklahoma City, secured from Mr. Brewer at Elmore City the addresses of Laurence Harman and her brother, Harold, and on the same date wrote them that he had a client who was interested in obtaining an oil and gas lease or purchasing the land. The letter named no price. It was addressed to Laurence Harman at Arnett, Oklahoma, and was later returned to the writer undelivered. The letter to Harold Harman was delivered to him about December 29, 1945, at Ada, Oklahoma, where he had shortly returned from service with the Marines. On January 2, 1946, Harold Harman went to Oklahoma City, and on January 3rd he talked with Mr. Godfrey, who advised him that his client would pay $75 an acre for a lease and $100 per acre from oil, if produced. Harold Harman told him that this offer was acceptable to him, but advised him to take the matter up with Laurence Harman, who was then at Ada, Oklahoma. Mr. Godfrey went to Ada on January 6th and found that his offer was satisfactory to Laurence Harman, who entered into an agreement with him to lease the land on the above terms. She explained that her brothers and sisters would have to be notified. Leases were prepared and mailed to all the other heirs for execution. The contract called for a lease on the entire 80 acres. In March, 1946, it was found that leases could be secured on only 90% of the 80 acres, and Mr. Godfrey advised Laurence Harman that since she could not carry out her agreement, the deal would have to be declined. Later, in March, 1946, his client agreed to accept leases on 90% of the acreage, and the deal was then closed.

On November 13, 1945, Sohio-Howard Well No. 1 was commenced in the section of land south of the Harman farm, and was drilling when the quitclaim deed to Laurence Harman was delivered. It came in as a producer in February, 1947, and this action was filed on May 7, 1947. Judgment was rendered for plaintiffs on December 4, 1947, canceling the quitclaim deed from plaintiffs to Laurence Harman, and for 3/5ths of the amount received by the defendants for oil and gas leases, less the sum received by the plaintiffs for the land and in satisfaction of the existing mortgage thereon and certain other expenses incurred by the defendants. The defendants have appealed, and we shall refer to the parties as they appeared in the trial court.

Defendants rely upon only two propositions. They claim, first, that the finding that Laurence Harman perpetrated a fraud in securing the quitclaim deed from Thomas F. Harman and his sisters is against the clear weight of the evidence; and second, that plaintiffs failed to comply with the law relating to rescission and are guilty of laches, and that there is a misjoinder of causes of action and an absence of necessary parties.

Plaintiffs alleged that Laurence Harman made false and fraudulent statements to Thomas F. Harman on December 25, 1945, when he delivered the quitclaim deed to her. They alleged, and he testified, that before delivery of the deed he asked Laurence Harman if there were any "oil activities" in the vicinity of the land, or any increase in the value of leases or royalty, and that she replied that there were no such activities and no increase in the value of mineral rights; when, in fact, she knew of the drilling of the Sohio well and the great increase in the value of leases and royalties. It is alleged that such false statements were made for the purpose of inducing him to deliver the deed, and did induce him to deliver it; that he would not have delivered it except for such false statements. He was acting for himself and his two sisters, and the entire question of whether or not fraud was perpetrated hinges upon the brief conversation between Thomas F. Harman and Laurence Harman at the home of Mrs. Adams on December 25, 1945. Laurence Harman flatly denies that he asked her anything about "oil activities" or the value of the leases and royalties. She further denies that she knew about the drilling of the Sohio well or the increase in prices of leases and royalties. Mrs. Adams testified that she heard no discussion between Mr. Harman and his niece concerning such matters; however, she stated that she was not within hearing during the entire conversation. No other witnesses heard any part of that conversation. Mr. Harman testified that his sister, Mary Thigpen, had advised him to make such inquiries and not to deliver the deed if he found that there was an increase in the value of the mineral rights, or any oil activity in the vicinity of the Harman farm.

Thomas F. Harman was a man more than 60 years of age. He had operated a hotel and cafe in oil territory in Texas. He had leased his farm in Texas for oil, and had several oil wells drilled on his own land. He knew of wells being drilled and oil fields being developed in the vicinity of the Harman land. He was oil-conscious, as shown by his inquiries of Mr. Brewer in Elmore City and of men in Pauls Valley concerning oil activities when he went to Pauls Valley in 1944; and in all the offers made by him to sell his interest in the Harman land, he placed a value upon the royalty separate from the surface rights. He knew that to lease for oil and gas a merchantable title was generally necessary, and that title to the Harman land was far from perfect. He testified that if he or one of his sisters should die, the title might never be made perfect. The evidence shows that he did not file this action until May, 1947, after the Sohio well had come in as a producer.

Laurence Harman was a young school teacher and wholly inexperienced in business affairs of any character. Her interest in the Harman land was valued at about $30, and she acquired the interest of her uncle and aunts for her brothers and sisters. She had not lived in Garvin county since 1938, and had no experience in leasing or dealing in oil properties. As administratrix she took no steps except upon the advice of her attorney and banker. After her discharge she allowed the taxes to become delinquent, and only paid them when advised by her banker to do so. After her discharge in October, 1943, she is not shown to have been in Garvin county except on the one occasion when she went there to see about the stove in 1944, until after the deeds here involved was delivered.

When Thomas F. Harman delivered the deed on December 25, 1945, he testified that he had his car with him at Holliday, Texas, and really wanted to go to Pauls Valley and investigate the value of the land he was selling. He admits that his contract to sell to Laurence Harman was completed by letter in the early part of December, 1945, and that he requested a lawyer to prepare the deed about December 5th. The delivery of the deed was made on December 25th. The record shows that he could have driven from where he was in Texas to the land in question in some three or four hours. He knew Mr. Brewer at Elmore City and had previously inquired of him about "oil activities" in that area, but it is not claimed by the plaintiffs that he made any effort whatever to find out about "oil activities" surrounding the land just prior to the delivery of the deed. It is not claimed by him that when he offered to sell the land to Laurence Harman he made any conditions whatever. He admits that he made a firm commitment to sell at a price fixed by himself, and that she accepted his offer and asked him to have the deed prepared. He knew that Laurence Harman was not living in Garvin county and had not lived there since 1938, and he does not claim that he made any inquiry of her as to when or from what source she obtained her information in regard to "oil activities" in the vicinity of the land in question.

There is no evidence whatever in the record to show that Laurence Harman knew anything about the Sohio well being drilled, or that she knew anything about oil and gas lease activities or any increase in value of leases or royalties around the Harman land. Mrs. Adams testified that she heard her uncle tell Laurence Harman, after he had delivered the deed to her, that he hoped that some day the land would be worth something, and that Laurence Harman told him that they hoped to sell a lease on the land for enough to pay off the mortgage. Mr. Harman did not claim that he advised his niece that one of his sisters had told him to inquire about oil and gas activities and not to deliver the deed if such existed, or if he found that there had been an increase in the value of leases and royalties in that area. He does not claim to have advised her that if such conditions had existed he did not intend to make delivery of the deed as he had previously agreed to do.

The letter which Laurence Harman wrote to her uncle during October, 1945, in which she offered to buy the 3/5ths interest in the farm, was not introduced in evidence. Mr. Harman testified that he accepted her offer by letter, but that letter had also been lost. If these letters had been in existence, it is possible that they contained sufficient statements to justify the court in holding that they constituted a binding agreement to sell land. The rule is well established that delivery of a deed is one of the necessary elements of a conveyance of title, and we must assume that Thomas F. Harman and his sisters had a legal right to refuse delivery up to December 25, 1945, when delivery was actually made.

It was claimed by the plaintiffs that a fiduciary relationship existed between Laurence Harman and the plaintiffs.

This was based largely upon the fact that the bank account was continued in her name after her discharge as administratrix, because the bank was not notified of her discharge. There is no evidence that she made any agreement with any of the other heirs to look after the farm for them after her discharge, and she did little with regard to the farm except to pay the taxes when reminded by her uncle, through the bank, that they were due. We cannot agree that a fiduciary relationship existed between Laurence Harman and the plaintiffs after her discharge as administratrix.

The record discloses that during the years 1945 and 1946, leases and royalty in the general vicinity of the Harman land sold at anywhere from $5 to $100 per acre, depending upon the location and the opinion of the purchaser. It is a matter of general knowledge that lease and royalty values are subject to almost instant change. No one, not even an experienced geologist, knows for certain the outcome of a drilling well in wildcat territory. Leases and royalties may be worth thousands of dollars today and nothing tomorrow. The Sohio well was begun in November, 1945. During the next 12 months there was considerable leasing activity around the well, and a number of royalty conveyances were made. The probate records of Garvin county at Pauls Valley disclosed the names and addresses of each of the 21 Harman heirs who owned an interest in the property involved. So far as the record goes, not a single offer to purchase any interest in this land was made, except in 1944 when Laurence Harman received an offer of $5 per acre for a lease, which she promptly communicated to the other Harman heirs, including Thomas F. Harman. One experienced lease broker, who dealt considerably in leases and royalties in that area, testified that he would have nothing to do with the Harman land because the title was mixed up and there were so many heirs, some of whom probably were minors. It is well known

that it is difficult to obtain a fair value for oil and gas rights unless a merchantable title can be delivered. When the deed here involved was delivered to Laurence Harman, she asked her uncle about an abstract, and he replied that at the price they were getting they could not afford to furnish an abstract, but that if she were able to lease the land for oil, the oil company would furnish an abstract.

The rule relating to actionable fraud is well established in this state. As expressed in Littlefield et al. v. Aiken, 130 Okla. 142, 265 P. 1054, actionable fraud exists when the following requisites are made to appear:

"(1) That defendant made a material representation, (2) that it was false, (3) that when he made it he knew it was false, or made it recklessly without knowledge of its truth and as a positive assertion, (4) that he made it with the intention that it be acted upon by plaintiff, (5) that plaintiff acted in reliance upon it, (6) that he thereby suffered injury; and, (7) All of these facts must be proved with a reasonable degree of certainty. The absence of any of them would be fatal to a recovery."

In the second syllabus of that opinion, this rule is stated:

"In this jurisdiction, where fraud is alleged in the procuring of a written instrument, the proof must sustain the allegations by a preponderance of the evidence so great as to overcome all opposing evidence and repel all opposing presumptions of good faith."

And in the body of the opinion it is said:

"The testimony must be clear, unequivocal, and convincing, and cancellation cannot be had upon a bare preponderance of evidence which leaves the issue in doubt. United States v. Maxwell Land Grant Co., 121 U.S. 325, 7 S. Ct. 1015, 30 L. Ed. 949, . . ."

In Moore v. Adams, 26 Okla. 48, 108 P. 392, this court said:

"Where fraud is alleged in the procuring of the execution of written instruments or deeds, the proof must

sustain the allegations by a preponderance of evidence so great as to overcome all opposing evidence, and repel the opposing presumptions. It should be of such weight and exigency as to satisfactorily establish the wrongful conduct charged; honesty and fair dealing as a rule being presumed."

It will be noted that at the time the deed involved was delivered, Laurence Harman had not been in Garvin county since 1944, and there was no testimony whatever that she had kept in touch with the banker or any other person in the vicinity of the land or had made any inquiry in regard to oil and gas activities there. She denies that she knew that the Sohio well had been commenced in November, 1945, and there is no evidence whatever to contradict her statement. There is no question but that a well was drilling near the Harman farm on December 25, 1945, when the deed in question was delivered, and that if Laurence Harman made the statements to her uncle that there was no increase in value and no oil activity, such representations were not true. It might be claimed that she made such statements recklessly, without knowledge of their truth and as positive assertions, but there is no testimony to indicate such fact.

Did Thomas F. Harman act and rely upon the statement which he claimed was made to him by Laurence Harman at the time the deed was delivered? In view of all the preceding circumstances, it is difficult to believe that he would have relied upon her statement without making some inquiry as to where and when she obtained the information she was giving him. The record shows that he had never before relied upon her for such information, but had made inquiry as to oil and gas activity from Mr. Brewer, the banker, and others in that vicinity. The testimony of Thomas F. Harman as to just what he told her at the time the deed was delivered is as follows:

"Q. Just tell the court what was said on that occasion. A. I told her I had deed in this form as it now is, and I had it with me, but first I wanted to know if there was any oil activity or oil well drilling around the place and if it had increased in value.

"Q. What did she say? A. She said there was not anything doing at all, and it had not increased in value, no oil activities or anything."

Upon the same subject, Laurence Harman testified as follows:

"Q. Did he ask you at that time whether or not an oil well was being drilled in that area? A. He did not.

"Q. Did you have any information in reference to any oil well being drilled or any leasing or the selling and transferring of any royalties, mineral rights or otherwise, that you withheld from him at the time? A. I did not.

"Q. Did he leave first or did you leave first? A. After he gave me the deed, he put his arms around me and said, 'If anything ever comes of it, I will be happy for you', and left."

Great stress is placed upon the fact that within less than two weeks after Laurence Harman had acquired this 3/5ths interest, being 48 acres, for the sum of $750, she was able to sell an oil lease thereon for $75 per acre, plus $100 per acre for oil, if produced. But the fact remains that only a single offer to buy a lease on the land is shown to have been made during the two preceding years. After the order of distribution to the 21 Harman heirs was entered on October 30, 1943, their names and addresses were all a matter of public record in Garvin county. No doubt the seeming lack of interest in this particular tract of land is due to the fact that two of the five Harman children had died and no probate proceedings had been had upon their estates, and all of the heirs had left Garvin county. The only party interested in leasing this land employed an attorney to secure a lease or buy the land. When the attorney, Mr. Godfrey, talked with Laurence Harman in Tishomingo on January 6, 1946, he had found an heir who knew all the heirs and who would undertake to secure

leases signed by all of them. She failed for over two months to secure leases covering over 90 per cent of the 80 acres. Mr. Godfrey called the deal off, but his client later agreed to close the deal on the leases acquired. We do not think there is anything unusual about the offer coming on the heels of the purchase, as changes are rapid in an oil-producing area.

The Harman land adjoined the section where the Sohio well was drilled. The broker who secured the block for Sohio in 1943 and 1944 inquired about the Harman land, but refused to have anything to do with it on account of the condition of the title. There is no evidence of any offers to purchase a lease or the royalty on this land, although plaintiffs claim it was worth from $50 to $100 per acre when it was sold to Laurence Harman, and prior to that time.

There is not a scintilla of evidence in the record to prove that Laurence Harman knew of "oil activities" in the vicinity of the Harman land or any increase in the value thereof on December 25, 1945, when the deed was delivered to her. Thomas F. Harman does not claim that he told his niece at that time about his instructions from his sister, Mary Thigpen, or of his own intention to refuse to make delivery of the deed, had he learned of an increase in value from November, 1945, when he made a firm agreement to sell at his own price, and December 25, 1945, when he was ready to deliver the deed.

A careful survey of all the evidence leads us to the conclusion that the findings of the court that the plaintiffs were defrauded is clearly against the weight of the evidence, and being a case of equitable cognizance, the judgment will be reversed, with directions to enter judgment for the defendant. In re Ho-Tah-Moie's Estate, 200 Okla. 532, 198 P. 2d 638; Ex Parte Miller, 201 Okla. 499, 207 P. 2d 290. Having so found, it is not necessary to discuss defendants' second proposition.

The judgment is reversed and the cause is remanded to the trial court to enter its judgment and decree in accordance with the conclusions and views herein expressed.