[Civil No. 3724. Filed September 28, 1936.]

[61 Pac. (2d) 158.]

ANNA LOU MONAGHAN and ELIZABETH ECKLES, Appellants, v. RUBY C. BARNES, Appellee.

Mr. E. S. Clark and Mr. Neil C. Clark, for Appellants.

Messrs. Laney.& Laney, for Appellee.

LOCKWOOD, C. J.—This is an action brought by Ruby C. Barnes, hereinafter called plaintiff, against Anna Lou Monaghan and Elizabeth Eckles, hereinafter called defendants, for a declaratory judgment as to the meaning of a written lease and option and to reform its terms. From the judgment rendered, this appeal was taken.

The uncontradicted facts and the issues of the case are as follows: On June 15, 1934, Anna Lou Monaghan and Elizabeth Eckles were mother and daughter, and were the tenants in common of certain real estate in the city of Phoenix, commonly called the Apache Hotel, each owning as her sole and separate property an undivided one-half interest therein. At the time the lease in question was executed, Mrs. Monaghan was in Phoenix operating the property as a hotel, while Mrs. Eckles was at her home in Glendale, California. Plaintiff, who was then the lessee of the San Carlos Hotel in Phoenix, was in Roches-

ter, Minnesota, the San Carlos property being managed by her husband, J. C. Barnes. Russell Shedd, who was a real estate agent in Phoenix, had approached Mrs. Monaghan in regard to the selling or leasing of the Apache Hotel, and, finding that she was disposed to consider an offer thereon, he, together with Barnes, called on her and discussed the possibility of a lease and option to purchase. Several visits were made at which the matter was discussed, and finally it was agreed that a written contract should be prepared to be submitted to Mrs. Barnes, in Rochester, and Mrs. Eckles, in Glendale, before it was finally executed. Barnes thereupon suggested that an attorney by the name of C. T. McKinney be employed to prepare the proposed lease and option, which was agreed to by Mrs. Monaghan, and a lease was so prepared. A copy thereof was delivered to Mrs. Monaghan, and she spent a day or two examining it and analyzing its terms. Barnes also made an extended examination thereof, and, when he was thoroughly satisfied that he understood it, he took two copies of the lease to Mrs. Monaghan and requested her to sign them. She signed for herself alone and agreed to send a copy to Mrs. Eckles in Glendale, while Barnes sent copies to Mrs. Barnes in Rochester. The latter examined the lease and, finding it satisfactory to her, signed and acknowledged it. Mrs. Eckles also carefully read the lease and consulted with her husband respecting its terms, and, finding it satisfactory, also signed a copy. Plaintiff entered into possession of the premises, under the lease, on the 1st day of July, 1934, and is still in possession thereunder.

At the end of the first quarter, rental was due on the premises and Mrs. Monaghan requested payment. Plaintiff answered, alleging that the amount claimed

by Mrs. Monaghan was in excess of that provided by the terms of the lease. The parties could not agree on the amount due, and the matter remained in abeyance until the second quarter's rental was due. There still being a dispute as to the amount, defendants employed counsel and notified plaintiff that they considered she had forfeited the lease by failure to pay the rent as therein provided, and demanded possession of the premises, which plaintiff refused to give.

Thereafter, and on January 18, 1935, plaintiff commenced this action, alleging that the written contract as it stood did not represent the true terms of the agreement between the parties, but that there had been a mutual mistake, and asking that it be reformed to conform to the alleged oral agreement which she claimed should have been placed therein. She further asked that, if the court declined to reform the instrument, it construe the terms thereof regarding the payment of rent, under its power to make a declaratory judgment. Defendants denied that there was any oral agreement of the nature set up by plaintiff, and further alleged, specifically, that the only agreement of any kind made by either of them was that in the written lease, and that Mrs. Monaghan had no authority to act for Mrs. Eckles in the matter, but that the latter had acted solely for herself. Defendants also cross-complained, setting up the failure of plaintiff to pay the rent prescribed by the lease, and asked for possession of the premises, the unpaid rental up to the action to terminate, and the fair rental value of the premises until possession was given.

The case was tried to the court sitting without a jury, and, at the conclusion of the argument, written request was made by defendants for special findings of fact and conclusions of law by the court.

Thereafter the court did file such findings and rendered judgment thereon on the 7th day of October, 1935. After the usual motion for new trial had been made and overruled, this appeal was taken.

There are eighteen assignments of error, several of which contain a number of subdivisions, but we prefer to consider the case on the basis of the propositions of law raised by these assignments and material for its determination. The first question is whether there was sufficient evidence to justify the court in finding that a mutual mistake of fact was made by the parties, so that the contract could and should be reformed to set forth the terms upon which they did agree. It is unquestioned that Mrs. Monaghan and Mrs. Eckles were tenants in common of the real estate involved herein, and it is also admitted that they were partners in the operation of the Apache Hotel. But, as such tenants in common, neither one could make a lease binding the entire premises without the consent and approval of the other, much less grant an option of purchase thereof. 62 C. J. 536 and 544 and notes. Since it is an admitted fact that Mrs. Eckles never directly participated in any of the negotiations which led up to the signing of the written lease, but at all times was in Glendale, and that all of the negotiations were carried on by Mrs. Monaghan individually, it is necessary for plaintiff, in order to establish that the true agreement was not embodied in the written one by mutual mistake, to show, first, that Mrs. Monaghan did agree to terms different from those expressed in the written instrument, and, second, either that she was legally authorized by Mrs. Eckles to make such an agreement, or else that Mrs. Eckles, after the oral agreement was made and with full knowledge of its terms, ratified it in a manner approved by law, or

was estopped from denying its execution. Since the contract is one involving the leasing of real estate for a longer term than one year and for its sale, no action could be maintained by plaintiff so as to bind Mrs. Eckles, unless Mrs. Monaghan was duly authorized in writing by Mrs. Eckles to make the agreement. Subdivision 6, §1521, Rev. Code 1928. It is admitted by counsel for plaintiff in their brief there is no evidence Mrs. Monaghan had such written authority. She could not, therefore, make a contract binding Mrs. Eckles' interest in the property. It is true that she might, as counsel say, enter into negotiations for the lease and sale of the property, and, if she notified Mrs. Eckles of the terms of the proposed lease and sale and Mrs. Eckles, *with full knowledge thereof,* executed the written instrument, the latter would be bound by the agreement actually made by Mrs. Monaghan. In the present case, however, both Mrs. Eckles and Mrs. Monaghan deny that the former, before she signed the lease, had any knowledge of any terms except those expressly set forth in the lease, and there is no evidence to the contrary. True, counsel for plaintiff argue, it is extremely probable that Mrs. Monaghan did communicate to Mrs. Eckles the oral agreement (which parenthetically the former denied ever having made), but probability cannot take the place of evidence on a disputed point. Such being the case, we think there is no basis for a reformation of the instrument on the ground of mutual mistake, for in such a case it must appear affirmatively that the parties did, as a matter of fact, agree to terms which were not set forth in the instrument as executed. 23 R. C. L. 327, and cases cited. Since there is no evidence that the necessary parties agreed to terms different from those set forth, the court was without authority to

reform the contract to express an agrement which was never made.

It is contended, however, that, even admitting this to be true, Mrs. Eckles afterwards ratified the oral agreement made by her mother. Ratification of the unauthorized act of an agent requires that the principal, with full knowledge of the unauthorized act, approved it. We can find no evidence in the record that this was done. Mrs. Eckles testified that she never knew of plaintiff's contentions until after the demand had been made for the payment of the rent according to the terms of the written lease, and that at all times thereafter she insisted on a compliance with its terms, nor is there any evidence to the contrary. The nearest there can be to any such evidence is that Mrs. Monaghan testified in general terms that she told her daughter all about the negotiations leading up to the preparation of the written lease, but, since at the same time she stated that these negotiations nowhere contained any terms different than those found in the lease, it can hardly be said to be an admission on her part that she communicated to her daughter something which she says never happened. Nor is there merit in plaintiff's claim that Mrs. Eckles is estopped from denying the oral agreement, since there is no evidence that Mrs. Eckles ever knew of the alleged oral agreement until after demand was made for payment of rent, in accordance with the terms of the written agreement, and, as from that time on she steadily insisted upon payment in accordance with its terms, it can hardly be said that any of the material elements of estoppel existed in her conduct. We are of the opinion, therefore, that plaintiff wholly failed to make out a case requiring or, indeed, authorizing the reformation of the written lease, on the ground that there was a

mutual mistake of fact between the parties thereto and that their true agreement was not expressed in the lease.

■ Counsel for plaintiff have called to our attention the case of *Miller* v. *Haley*, 38 Ariz. 469, 300 Pac. 1020, wherein we held that a salesman who was not authorized to include certain conditions within a written agreement for the sale of an automobile nevertheless bound his principal by the terms included by him without their knowledge. In that case, however, the automobile company was attempting to enforce a contract which did not contain the terms agreed to by the salesman. We held that, if they insisted upon the enforcement of the contract, they must take the one which was really made between their salesman and the purchaser, but we also said that, had the purchaser been attempting to enforce the contract containing the unauthorized terms as against the company, the situation would have been very different. In this case it is plaintiff who is attempting to enforce the unauthorized contract, and not defendants. The learned trial court therefore erred in attempting to reform the contract, even if it was justified in concluding that the evidence showed that Mrs. Monaghan and Mrs. Barnes did agree upon terms different from those expressed in the written instrument.

■ We consider next the declaratory portion of the judgment which contains the construction placed by the trial court on the written contract. The clause in question is in the following language:

"2. The lessee in consideration of leasing the above described property agrees to pay to the lessor as rent for the above-mentioned property, $2,400.00 per annum for the term of this lease, and in addition to the rental herein specified, the lessee agrees to pay to the lessor one third of the gross annual income

from the room rentals in the hotel in excess of $2,400.00. The payments to be made in the following particulars, to-wit: $200.00 on the 1st day of each month beginning July 1, 1934, and each month thereafter during the term of this lease, and at the end of the first, second, and third quarter after the effective date of this lease, the lessee will pay the lessor one third of the gross income from the room rentals in excess of $600.00 which sum is the total of the three monthly payments and at the expiration of the fourth quarter the lessee will pay to the lessor one third of the gross annual income from room rentals in excess of $2,400.00, less all monthly and quarterly payments paid the lessor during the immediately passed year, and the same manner of payment shall be used throughout the term of this lease.''

Plaintiff claims the annual rental is one-third the gross annual room rentals, with a minimum guaranty of $2,400. Defendants insist it is a minimum of $2,400, plus one-third of the gross room rentals in excess of $2,400. The vital difference is whether the $2,400, which both parties agree must first be paid, is to be deducted from the total gross revenue and the remainder divided by three to constitute additional rental, or it is to be considered as part of a gross one-third of the room rentals in case one-third exceeds the $2,400. The effect of using plaintiff's theory would be to give defendants $1,600 per annum less rent whenever the gross annual room rentals exceeded $7,200. Let us analyze the clause and determine, if possible, its true meaning. There are two sentences found therein, the first of which, by its terms, fixes the *amount* of the rental, and the second, the time and manner in which it is to be paid. If the first sentence stood alone, there could be no possible doubt of its meaning, for it expressly provides that the one-third of the gross room rentals in excess of the $2,400 shall be *in addition* to the sum last named, and not that the $2,400 is *included* in the

one-third to be paid defendants. Nor does plaintiff seriously dispute this. Her contention is that the two sentences must be considered together, and that, so considered, the second so modifies the meaning of the first it is plain her position is correct. Let us apply the language of the second sentence alone to a hypothetical situation.

Assume the gross annual room rental is $18,000, received in equal amounts each quarter. Plaintiff must pay $200 per month in advance for the first quarter, or $600 for the three months. That sum is then deducted from the quarterly gross income of $4,500, leaving $3,900, and one-third of this, or $1,300, is to be paid as additional rent, making the total quarter's rent paid $1,900. This process is repeated for the next two quarters, and defendants will thus have received $5,700. During the fourth quarter, they will receive an additional $600 in the regular monthly payments, so that by the last day of that quarter they will have been paid $6,300. So far the payments have been made strictly according to the second sentence of the clause and also fully within the meaning of the first sentence. The proper proportion of the definite annual rental has been paid each quarter. Then that amount has been deducted from the gross room rental for the quarter, and one-third of the sum so left has been paid as due, in addition to the definite rent. This process has been repeated twice, and the fixed rent of $600 for the last quarter added thereto. The gross room rental for that quarter is $4,500, the same as for each preceding quarter, and all that is left is to calculate how much of that is to be paid as excess rent for that quarter. And how does plaintiff claim that is to be done? She takes the total *annual* gross room rent of $18,000 and divides it by three. This gives her $6,000, which,

according to her claim, is all she has to pay for the year, it exceeding $2,400. Since she has already by the express provisions of the second sentence paid $6,300, she has overpaid the rent $300, and defendants owe her a return of that amount.

But even this computation does not follow the express language of the sentence in regard to the last quarter's excess rent. Taking it literally, one must first deduct from the annual gross room rent of $18,000 the sum of $2,400 and divide the remainder by three, which gives $5,200. From this $5,200 must be deducted the "monthly and quarterly" payments of $6,300 already received, leaving the unfortunate defendants owing plaintiff $1,100. That a rental already due and paid of $6,300, with an additional gross revenue for the fourth quarter of $4,500, should suddenly be transformed into an excess rental of $1,100, is certainly an unusual proceeding, to put it mildly. To our minds the true situation is clear. The word "monthly" was obviously inadvertently and unintentionally inserted in front of the words "and quarterly." Delete that word and the whole clause becomes consistent, intelligible, and reasonable. At the end of the fourth quarter, we deduct from the gross annual income of $18,000 the $2,400 definite rent already paid, leaving an excess annual income of $15,600. That is divided by three, giving a rental of $5,200 for the year *in excess of the fixed rent of $2,400*. But of this, $3,900 has already been paid in the quarterly payments, so there is still due defendants the sum of $1,300 on the year's rent, the same excess rental as has already been paid for each of the preceding quarters. We therefore hold that, since it is clear the word "monthly" above referred to was used inadvertently and is inconsistent with and repugnant to the meaning of the parties, it will be re-

jected altogether. *Buck* v. *Burk,* 18 N. Y. 337; *Harney* v. *Wirtz,* 30 N. D. 292, 152 N. W. 803; *Davis* v. *Frazier,* 150 N. C. 447, 64 S. E. 200; *Hibbard* v. *McKindley,* 28 Ill. 240. So treated, the meaning of the entire clause fixing the rent is certain and plain. Plaintiff was bound to pay $200 per month in advance, plus one-third of the gross room rent in excess of $2,400, these last payments to be computed and made quarterly.

But, even assuming the word "monthly" may not be deleted and plaintiff may stand on the letter of the second sentence of the clause, entirely disregarding the first sentence, she is in no better situation. The difference in opinion as to the amount of rent due arose at the end of the first quarter, and by the end of the second quarter only the fixed $200 per month had been paid by plaintiff. On January 12, 1935, the additional rent for the first two quarters being undoubtedly due and payable, she tendered to defendants, as full payment of such additional rent for the two quarters, the sum of $422.49, when, according to her own report of the gross rentals, there was due defendants as additional rent for the first quarter the sum of $215.08 and for the second quarter the sum of $1,007.49. Plaintiff not only failed to pay any of this, but made a conditional tender of about a third thereof. Notice of default was given plaintiff on January 4, 1935, by registered mail, and at the end of thirty days defendants had the option of declaring the lease at an end. This they did by their cross-complaint. Even if by the terms of the lease plaintiff would have been entitled to a refund at the end of the fourth quarter, on June 30, 1935, she could not refuse to make the required payments during the first two quarters and then take advantage of the fourth quarter refund.

■■ Since, as we have pointed out, the lease cannot be reformed on the ground of a mutual mistake of all of its makers, it must be enforced according to its terms. The rent required was not paid by plaintiff, and under its express provisions defendants had then the right to terminate it by written notice, and to recover possession. This notice was duly given, but plaintiff refused to surrender possession, and in this action defendants cross-complained, asking for possession and compensation. In plaintiff's reply to the cross-complaint she, of course, denies that rent was due as contended by defendants, but also asks that if it be found to be due, she be permitted to pay it and continue with the lease and option, this request being based on the equitable powers of the court. To grant this petition would be to lay down the rule that a tenant may, over the protest of his landlord and a warning of forfeiture, refuse to pay the rent legally due, and ask, first, for a change of a written lease, and, second, for a construction of its terms different from the true one, and when the court finally, years later, resolves the dispute in favor of the landlord; tender the rent which is so long overdue and be reinstated with all his original rights, merely because he honestly believed his contentions were correct.

The lack of equity in such a holding is apparent from its mere statement. We appreciate the good faith with which the trial court found plaintiff acted and the loss which she, perhaps, may suffer by the termination of her lease and option, and we must also presume that defendant Mrs. Eckles, at least, acted with equal good faith and what her loss would be under a different holding. Where equities are equal, the law must prevail, and the law unquestionably says that, under the circumstances which appear in

this case, defendants are entitled to recover on their cross-complaint.

The judgment is reversed and the case remanded, with instructions to ascertain the reasonable value of the use and occupation of the premises from the time the lease was terminated, and to render judgment in favor of defendants for such sum, for the rent due under the lease until such termination, and for the possession of the premises.

McALISTER and ROSS, JJ., concur.