ESTATE OF GABLER: LUCAS, Respondent, vs. GABLER and others, Appellants.

*September 11—October 6, 1953.*

32

For the appellants there were briefs by *George J. Larkin* or Dodgeville, and *Aberg, Bell, Blake & Conrad* of Madison, for executors and devisees, and by *Harry A. Speich* of Mineral Point, guardian *ad litem* for minors, and oral argument by *W. J. P. Aberg* and by *Charles P. Seibold* of Madison.

For the respondent there was a brief by *Jones & Hamilton* of Dodgeville, and *Roberts, Roe, Boardman, Suhr & Bjork* of Madison, and oral argument by *Frank D. Hamilton* and *W. Wade Boardman.*

FAIRCHILD, J.   A court may, in the exercise of a sound discretion, grant a decree for specific performance of an executory contract for the sale and conveyance of land where the contract has been entered into by competent parties, and not obtained by fraud or unlawful advantage, but is equitable in its nature and the circumstances surrounding it.   If it is established that a land contract was made and that the obligations of a vendee have been performed according to its terms to the acknowledged satisfaction of the vendor, the vendee is then entitled to specific performance.

It was held by the trial court that the evidence required findings establishing the conclusion that a valid and enforceable contract had been executed and existed between the respondent and the deceased entitling respondent to specific performance. Elmer Gabler, son of the deceased and one of the executors, testified that the signatures on the contracts were the true signatures of the parties and that the indorsements were in the handwriting of the deceased. The testimony of William Gottschall, a friend and neighbor of the deceased, was that in a conversation which took place in October, 1950, he asked the deceased whether Clarence Lucas owned the stock and machinery, and the deceased answered, "Yes, he owned the stock and machinery," and he said, "I have a land contract with Clarence." Another neighbor, Henry Gottschall, testified to the following effect: "I had a conversation with Mr. Gabler in February of 1951 in the hospital here in Dodgeville. Him and I were in the same room for a week. We was there about a week and he went home and then came back. This conversation took place at the hospital before he went home the first time. Well, we was in the hospital and talking about business and he asked how I had my farm rented and I said on 50-50; he said he had his farm rented to Clarence Lucas but he had made a contract with him, land contract—thought that was less trouble—and a patient come in and we quit talking and no more said. As to whether he stated whether or not his land contract was with Clarence Lucas or Mabel Lucas or both of them, he said with Clarence Lucas, Clarence and Mabel, the words he said."

An analysis of the conduct of William Gabler in his transactions with Clarence and Mabel Lucas and a study of the provisions of his will make manifest a well-planned scheme on his part to provide security for his daughter Mabel, and at the same time to deal fairly with Clarence.

The Lucases went on the farm in March, 1934, and have lived there without interruption to the present time. At the

time they moved on the farm, Clarence Lucas made what is known as a lease agreement on a 40-60 share basis, with the option of extending such lease four more years. The lease was not put into writing until April 10, 1935. At about the time the lease would have run out, in 1939, circumstances arose which are described in Lucas's own words as follows:

"I had a chance to buy another farm and I told him that—he come down just as the people had left and asked what they wanted and I told him and he didn't like it very well—he went back to town and came back the next day and said he would let me have this for the same. The price then was $8,000 and he said 'I will even do better.' Then he did for $7,000. There wasn't anything ever more mentioned about it. . . . I signed the contract but where I don't know. I don't know if my wife signed a contract at that time but I presume she did. As to whether or not this contract . . . was signed by my wife at or about that time, 1939, I think so. When my father-in-law discussed the matter of sale of the farm with me, he said to me about the matter of silence that I should not tell anybody, not Loraine or Elmer or nobody—'let people think you are renting.' Mabel Lucas was present."

William Gabler was much concerned about his daughter's ability to take care of herself and was of the opinion that if the farm was hers—Clarence and Mabel would have the advantage of a sustaining piece of property and a comfortable home. The deceased and his wife looked upon Mr. and Mrs. Lucas as a family unit and felt assured that the contract would carry out their plan. As far as title to the farm is concerned, he wanted it in his daughter Mabel. As a further safeguard for the security of his daughter Mabel, deceased provided in the land contract that she, Mabel Lucas, was not to sell or mortgage said farm without the express consent of her guardian and the court of Iowa county. The plan of William Gabler and his wife is further made plain by the following testimony: In 1951, while at the hospital, Mr. Gabler told

Clarence Lucas, "Take the farm and stand up for your rights." And also at about that time Mrs. Gabler said, "They were all the time fussing around wanting to change something [the writing]" and said, "It was a good thing it happened now the way it did—you [Clarence Lucas] will have the farm and Mabel will have her money." Joyce Lucas testified that in February, 1951, she overheard a conversation between William Gabler, Sophia Gabler, his wife, and Elmer Gabler about changing the contract, and that William Gabler said that Clarence had "worked hard all his life and if something was changed he would not have what he worked for."

Although Mabel Lucas was not able to remember the details of the transaction as far back as 1939, she testified that she signed the contracts knowing that they "carried out something for me." Her unquestioned signature is on the contract, which on its face appears regular in every way.

From the foregoing evidence it is clear that the land contract was at the time of its execution in the minds of William Gabler and his wife and also in the minds of Clarence and Mabel Lucas.

Without reviewing all the details and items occurring in the testimony, the evidence shows that under the terms of the contract the $7,000 had been paid. In fact, one of the contentions made by appellant as tending to establish that there was only a leasing arrangement in existence between Mabel and Clarence Lucas, was that more than $7,000 had been paid by Clarence Lucas. The obligations of both parties were fully performed, there was a meeting of minds between the parties, and no actual delivery of the contract was necessary. *Estate of Dohm,* 188 Wis. 626, 206 N. W. 877; *Estate of Powell,* 206 Wis. 513, 240 N. W. 122.

In conclusion we agree with the respondent's contention that the problem in this case arose because Mabel Lucas could not remember in 1951 what had happened in 1939. The learned trial judge, displaying a keen appreciation of the

human personalities and relationships involved, and in compliance with the governing principles of law, reached a just conclusion, and the judgment entitling respondent to specific performance must be sustained.

The fact that the date 1934 appears on the contract is not of great importance when the foregoing evidence is considered and the manifest plan of William Gabler for the Lucases is understood. The indorsements in William Gabler's handwriting begin under date of April 10, 1935, and it may well be that he meant the contract to date back to the time when the Lucases first leased the farm, the payments made under the lease to apply upon the land contract.

The motion for a new trial was properly denied. It was based on the ground of newly discovered evidence, and the trial court did not abuse its discretion in ruling as it did. The evidence submitted as newly discovered evidence was such as to show that it was not probable that a different result would be reached on another trial.

*By the Court.*—Judgment and order affirmed.