227 F.2d 49
 PACIFIC ROYALTY COMPANY, a corporation, Appellant,
v.
Carl H. WILLIAMS; John W. Williams; Mrs. John A. Cline, Jr.; John A. Cline, Jr.; Mrs. F. S. Hollebeke; F. S. Hollebeke; Paul Eugene Williams, Jr.; Lottie May Treas; Robert M. Treas; Byron Leslie Williams; Marvin Lester Williams; Ruby Leona Williams; Jessie R. Williams; Edith Lillian Williams, single, who is incompetent and who brings this suit by her next friend; and Carl H. Williams, Appellees.
Johnstone BATES and William Rufus Bates, Cross Appellants,
v.
PACIFIC ROYALTY COMPANY, a corporation, Cross-Appellee.
 No. 4827.
 No. 4828.
 United States Court of Appeals Tenth Circuit.
 June 21, 1955.
 Rehearing Denied December 12, 1955.
 
 COPYRIGHT MATERIAL OMITTED Ross L. Malone, Jr., Roswell, N. M. (J. D. Atwood and Charles F. Malone, Roswell, N. M., were with him on the brief), for appellant and cross-appellee.
 William A. McKenzie, Dallas, Tex., and J. R. Modrall, Albuquerque, N. M. (Simms & Modrall, Albuquerque, N. M., Wynne & Wynne, Dallas, Tex., were with them on the brief), for appellees and cross-appellants.
 Before MURRAH and PICKETT, Circuit Judges, and SAVAGE, District Judge.
 PICKETT, Circuit Judge.
 
 
 1
 The plaintiffs, who are the heirs at law of Lester L. Williams and Gertrude A. Bates, have joined together in this action to quiet title to the minerals underlying 320 acres of land in Lea County, New Mexico, and alternatively to establish a trust in the minerals, to procure an equitable accounting, and to rescind the deed through which the appellant Pacific Royalty Company claims the minerals. In 1919, Lester L. Williams received a patent on a homestead entry to the land in question, and almost immediately thereafter he mortgaged it to the F. B. Collins Investment Company to secure an indebtedness of $900.00. This mortgage was thereafter assigned to Gertrude A. Bates, who resided in the State of Michigan. Williams then sold the land to William C. Stoneman but later it was deeded back to Williams. The questions in this case arise from the transactions surrounding the collection of the note and mortgage beginning in 1926.
 
 
 2
 During that year the Williams mortgage was delinquent and it was forwarded to Union Mortgage Company of Dallas, Texas, a corporation wholly owned and operated by J. E. Whitehead, an attorney, for the purpose of collection. The Union Mortgage Company handled real estate mortgages, including the servicing and collection of mortgages owned by others. After foreclosure proceedings had been instituted on the Williams mortgage, Whitehead obtained a deed from Williams and his wife in which C. H. McKinney was named as grantee. Whitehead, using a deed which had theretofore been signed in blank by McKinney and his wife, conveyed the lands to a third person and reserved the mineral rights. By the same method the mineral rights were conveyed to the defendant Pacific Royalty Company, which was another corporation owned by Whitehead. The Williams heirs contend that the deed to McKinney was void because of fraud by Whitehead and because there was no delivery and acceptance of the deed by McKinney. The claim of the Bates heirs is based upon the trust relationship that existed because of Whitehead's position as an attorney for Bates in collecting the note and mortgage. The Williams heirs and the Bates heirs through a crossagreement and transfer, each claim an undivided interest in any recovery.
 
 
 3
 Pacific appeals from an adverse judgment quieting title to the minerals in the Williams heirs, granting them an accounting for monies received from the minerals, and denying Pacific's cross-action to quiet its title in the minerals. The Bates heirs cross-appeal from a judgment denying them any recovery. The trial court reserved decision as to the right of the Bates heirs to participate in the Williams' recovery under their crossconveyance.
 
 
 4
 For a determination of the questions presented, a detailed statement of the facts is necessary. At the time of the trial, all of the parties, except McKinney, who had anything to do with the transactions were dead. The files of the executor of the Bates estate and of the brokers who serviced the mortgage were not available. What actually happened is difficult to determine, and it must be obtained from somewhat fragmentary correspondence and documents, most of which were obtained from Whitehead's files. A. W. Knapp & Co. of Detroit, Michigan, was a mortgage broker and it had sold the Williams mortgage to Mrs. Bates under an agreement to service it and in case of default to substitute another mortgage in good standing. After the death of Mrs. Bates, her executor, Bankers Trust Company of Flint, Michigan, and its successors, forwarded the mortgage to A. W. Knapp & Co.[1] for servicing. Knapp had an arrangement with Union Mortgage Company under which it referred defaulted mortgages covering lands in that area for collection, adjustment, or for the substitution of new mortgages in good standing. The executor did not know that Knapp would forward the loan to Union for collection. It was understood between Knapp and Union that the mortgagee would be satisfied with a return of the principal and interest due on the mortgage, and that Union might make a profit for itself in handling transactions of this nature over and above the regular collection charges,[2] including attorney fees for Whitehead.
 
 
 5
 Union or Whitehead had no direct connection or dealings with the Bates Estate, but handled the matter for Knapp under the existing arrangement.
 
 
 6
 Upon receipt of the Williams' mortgage for collection, Whitehead was at first unable to find Williams, and he instituted a foreclosure action. In the meantime, Whitehead located Williams and the correspondence which followed provided the basis of fraud upon which the trial court relied to cancel the deed executed by Williams and his wife. Whitehead wrote to Williams requesting that he sign a waiver of summons in order to save the cost of making service. The waiver of summons was executed and returned to Whitehead, but the enclosure letter is missing. Whitehead, upon receipt of the waiver, wrote Williams and stated that he had hoped Williams would be able to redeem his farm. The Whitehead letter indicates that Williams had advised that he was not in a position to take care of the obligation. Whitehead suggested that farm lands were not selling well, that this particular place would not bring one half of the amount against it if sold "under the hammer". He enclosed a deed with a request that Williams and his wife execute it and return it to him. He stated that this would be the best way out for all concerned, and would save the cost of foreclosure and a deficiency judgment against Williams. The grantee named in the deed was C. H. McKinney, a tenant of Whitehead. Before executing the deed, Williams wrote to Whitehead and asked who McKinney was and what his interest was in the land. He also inquired if he would be given an opportunity to redeem. Upon receipt of this letter, Whitehead wrote explaining that the mortgage belonged to the estate of Gertrude A. Bates, and that the heirs did not want to get the title to the land involved with the estate. "For that reason, we are having the deed made to Mr. McKinney, a relative, who will hold it for the benefit of this Estate. The land will be accepted in full settlement of your obligation, and if you desire you may redeem the property or buy it back, this next fall." Immediately thereafter, Williams wrote Whitehead and inquired if McKinney could get a release of the coupons that the mortgagee held against him. He stated that the last coupons which he had paid had not been returned.[3]
 
 
 7
 Williams and his wife executed the deed on December 11, 1926, and it was recorded on December 17, 1926. There is nothing in the record to indicate how it came into Whitehead's possession. The foreclosure action was dismissed without prejudice. The record does not disclose whether the original note was delivered to Williams but it may have been. In 1930, when Union was making a settlement with the Bates Estate, the original note could not be found and Whitehead wrote to Williams and asked if the note had been delivered to him.[4] It was never found. After receipt of the deed from Williams, Union undertook to sell the property and reserve the mineral rights. This, it was able to do by 1930, and it obtained more than enough to pay the note, together with interest. The sum over and above the amount due was retained by Union pursuant to its understanding with Knapp.
 
 
 8
 Whitehead's arrangement with McKinney was unusual. The latter was known to Whitehead only through an agent named Locke. All negotiations and conversations with McKinney in 1926 on behalf of Whitehead were by Locke, who is deceased. In addition to being a lawyer, Whitehead apparently was a speculator in real estate and evidently was having financial troubles. Several tracts of land were to be conveyed to McKinney to protect Whitehead against civil judgments. McKinney executed a number of deeds in blank for the purpose of reconveying the same to Whitehead or his designee and delivered them to Locke. McKinney had no knowledge of the particular lands which were to be placed in his name. He claimed no interest in any of the lands, admitted that he was holding them for Whitehead, and testified that he had agreed to act as Whitehead's dummy or strawman. He knew that sooner or later Whitehead would divest him of the title to the lands in his name by filling in and completing the blank deeds. He testified he had no objections to Whitehead's actions in that respect. He had no knowledge of the Williams' transaction, and the deed was not delivered to him. The Williams land was conveyed to Pacific Royalty Company by warranty deed dated about a month before the Williams deed came into Whitehead's possession. This deed was not recorded until 1948.[5] However, a deed acknowledged March 28, 1927, and recorded April 2, 1927, showing McKinney to be a single man, conveyed the mineral rights to that land to Pacific Royalty Company. This deed was acknowledged before Lura G. Wood, a Notary Public in Tulsa, Oklahoma. McKinney admitted his signature and testified that he did not know the notary and that he had never been in Tulsa. After Whitehead settled with the representatives of the Bates Estate in 1930, nothing further was heard from either Williams or Bates until 1949.
 
 
 9
 In that year, it appeared that this land was valuable because of the possibility that it contained substantial quantities of oil and gas. Representatives of the Shell Oil Company sought to lease it from Whitehead. The terms finally agreed upon included a cash bonus of $96,000, a $320,000 payment from production, and the usual one-eighth royalty interest. However, Shell was not satisfied with the title. Whitehead located McKinney and requested that he execute a correction mineral deed because his wife had not signed the original instrument. The correction deed was obtained from McKinney upon the payment of a consideration.
 
 
 10
 Some time thereafter, W. H. Gilmore investigated the matter and concluded that the Bates heirs had a claim to the mineral rights. He purchased whatever claims they had for $1,000, and armed with this conveyance, instituted an action in the State Court of New Mexico asserting the Bates' claim. The case was removed to and tried in the United States District Court of New Mexico. After the issues were drawn and the case was ready for trial, Gilmore decided that he could not prevail. It was then stipulated that his action should be dismissed with prejudice, and a judgment was entered on a counterclaim quieting the title to the mineral rights in Pacific Royalty. Shortly thereafter, one of the attorneys for the plaintiffs in the instant action made an extensive investigation, including the records in the Gilmore Case, and concluded that either the Bates heirs or the Williams heirs owned the mineral rights to the lands. After discussions with this attorney, the Bates heirs purchased a reconveyance of their rights from Gilmore for $10.00, and $3,000.00 if the litigation was successful. The Williams heirs and the Bates heirs pooled their interests and entered into a contract with the attorney who was to receive fifty percent of the recovery. The Bates heirs and the Williams heirs by cross-conveyances were to divide the balance.
 
 
 11
 The interests of the two sets of heirs are in direct conflict. For the Williams heirs to prevail, we must conclude that the transfer from Williams was void and that title never passed to McKinney, Whitehead, or Pacific Royalty. If the Bates heirs are to recover, it must be established that Whitehead, as attorney for Mrs. Bates, obtained title and held it in trust for her. The trial court did not consider the cross-transfer, and neither shall we.
 
 
 12
 The defendant first contends that the trial court erred in not sustaining its plea of laches. The court found that the Williams heirs "had no knowledge of the fraud which had been practiced upon their father, and mother, and had no reason to know the same, and were entirely ignorant of it until a very short time before the filing of the present suit. * * * They exercised all the reasonable care and diligence which could have been expected or required of persons in their circumstances and conditions of life. Without more knowledge than they possessed or should have possessed, it must be found that they did act with reasonable diligence, and there was no discovery of the fraud by them or any of them until just prior to the filing of this suit." It was also found that Lester L. Williams and his wife did not know of the fraud during their lifetime. From these findings the court concluded that the Williams heirs were "entitled to rescind and to have the deed executed by their father and mother to McKinney cancelled and held to be null and void."
 
 
 13
 The question of laches is generally addressed to the sound discretion of the trial judge. Potash Company of America v. International Minerals and Chemical Corporation, 10 Cir., 213 F.2d 153. Although it is a close question, we do not think the record shows an abuse of discretion in denying the plea of laches as to the Williams' claims or that the conclusion of the trial court is clearly erroneous.
 
 
 14
 This brings us to the question of whether there was a material misrepresentation by Whitehead which induced the execution and the delivery of the deed and which would constitute actionable fraud. In holding that the deed did not pass title to Whitehead or Pacific Royalty, the trial court found "that the representations made to Williams that C. H. McKinney was a relative of Gertrude Bates and that he would hold the Williams land for the benefit of the Bates estate were false and untrue. They were made by Whitehead with the intention to deceive Williams and to induce Williams to execute a deed to the land under the belief that McKinney was a relative of Gertrude Bates and that McKinney would hold the land for the benefit of the Bates Estate, and, also, that he, Williams, would be released from all liability. I find that Whitehead made such false and fraudulent representations knowingly to mislead and deceive Williams." The court held that a grantor has the right to know his grantee and that "any representation as to the grantee and the capacity in which he is to receive title is so material it cannot be rejected as being immaterial and of no consequence." This is not an accurate statement of the law.
 
 
 15
 The essential elements of actionable fraud are a false representation of a material fact, knowledge of its falsity when made, intent to deceive, and reliance thereon with resulting damages. 17 Words and Phrases, Fraud, p. 522; 37 C.J.S., Fraud, § 3; Southern Development Co. of Nevada v. Silva, 125 U.S. 247, 8 S.Ct. 881, 31 L.Ed. 678; Davis v. Wilson, 8 Cir., 276 F. 672; Pace v. Parrish, Utah, 247 P.2d 273; Wishnick v. Frye, 111 Cal.App.2d 926, 245 P.2d 532; Thompson v. Teel, 204 Okl. 105, 227 P.2d 395; Koen v. Cavanagh, 70 Ariz. 389, 222 P.2d 630. Fraud will never be presumed and will be sustained only upon evidence that is clear and convincing. 37 C.J.S., Fraud, § 114; Southern Development Company v. Silva, supra; Union Railroad Co. v. Dull, 124 U.S. 173, 8 S.Ct. 433, 31 L.Ed. 417; Davis v. C. I. R., 10 Cir., 184 F.2d 86; Greene v. Esquibel, 58 N.Mex. 429, 272 P.2d 330; Jones v. Citizens Bank of Clovis, 58 N.Mex. 48, 265 P.2d 366; Frear v. Roberts, 51 N. Mex. 137, 179 P.2d 998; Consolidated Placers, Inc., v. Grant, 48 N.Mex. 340, 151 P.2d 48. The burden is even greater in cases where the person to whom the fraud is attributed is dead. New v. H. E. Harman Coal Corp., 181 Va. 627, 26 S.E.2d 39; Grigg v. Hanna, 283 Mich. 443, 278 N.W. 125; Prevost v. Gratz, 6 Wheat 481, 496, 19 U.S. 481, 496, 5 L.Ed. 311. Fraud, to be actionable, must relate to a present or pre-existing fact, that is, fraud may not be predicated upon representation as to matters which are to happen in the future. 23 Am.Jur., Fraud and Deceit, Sec. 35, 38; 1 Black on Recision, p. 254; United States v. Stanolind Crude Oil Purchasing Co., 10 Cir., 113 F.2d 194, 201; Werner v. City of Albuquerque, 55 N.Mex. 189, 229 P.2d 688; Witt v. Cuenod, 9 N.M. 143, 50 P. 328. This rule does not apply to cases where there was a promise of future action made to accomplish the fraud and with no intention of performing. Werner v. Albuquerque, supra. The only false representation of an existing or pre-existing fact which Whitehead made to Williams was in his letter of November 18, 1926, wherein he wrote Williams that title was being taken in McKinney to prevent the title from becoming involved in the Bates Estate, and that McKinney was a relative who would hold it for the benefit of the estate. This is the only fraud the plaintiffs relied upon in their pleadings. Prior to this statement, Whitehead had advised Williams that if he would surrender title to the property, the foreclosure action would be dismissed and there would be no deficiency judgment against him. In his November 18th letter, he advised Williams that it would be better for him to deed the property over, rather than to let the suit continue and have the property sold under foreclosure with the possibility of a deficiency judgment. He stated, "* * * if we can get the title perfected we can then dismiss this suit and that will end the matter." Following this letter, Williams wrote to Whitehead and asked him if McKinney could get a release of the interest coupons which the mortgagor held, stating that the last coupons which he had paid had not been sent to him. Whitehead replied that he had the original note and mortgage in his possession and that he would deliver them to Williams when he received the Williams deed and another from the Stonemans. The Williams deed to McKinney was recorded on December 17, 1926. The consideration stated was $1.00 and the assumption of the $900.00 Williams mortgage.
 
 
 16
 Concededly, the statement that McKinney was a relative of Mrs. Bates was false, but a fair analysis of the correspondence indicates that this was of no particular concern to Williams. It is evident that he was willing to convey the land to discharge his obligation under the note and mortgage. It is also quite evident that his inquiry about McKinney was to find out if he could obtain from him a full release of that obligation, including the interest coupons. The record is also clear that Williams received the consideration for which he bargained, that is, a complete release and satisfaction of his obligation under the note and mortgage. Consequently any promise of Whitehead for future action which induced him to execute the deed was performed. The foreclosure suit was dismissed. Whether the note was delivered to McKinney upon the delivery of the deed or thereafter, is not disclosed. The mortgage was released in 1930 after a sale of the property had been consummated, and no demand for further payment was ever made upon Williams or his heirs. It is not now contended that there is any liability on the note and mortgage. Twenty-six years after the transfer, at a time when the value of the property had increased from about Nine Hundred Dollars to One Million Dollars, they seek to set aside the conveyance because there was a misrepresentation of the grantee's identity. This is actionable fraud only when it is shown that the grantor would not have executed the conveyance had the true identity of the grantee been known. Walker v. Galt, 5 Cir., 171 F.2d 613, certiorari denied 336 U.S. 925, 69 S.Ct. 656, 93 L.Ed. 1086; Robinson v. Richards, 209 Mass. 295, 95 N.E. 790; Tollett v. Montgomery Real Estate & Ins. Co., 238 Ala. 617, 193 So. 127; Williams v. Kerr, 152 Pa. 560, 25 A. 618; Hood v. Cline, 35 Wash.2d 192, 212 P.2d 110; Craig v. Shea, 45 Cal.App. 351, 188 P. 73; Cohn v. Knabb, 105 Wash. 363, 177 P. 794; Cole v. Hunter Tract Improvement Co., 61 Wash. 365, 112 P. 368, 32 L.R.A.,N.S., 125; Wilkirson v. Thompson, Tex.Civ.App., 104 S.W. 2d 1115; Hall v. Bollen, 148 Ky. 20, 145 S.W. 1136; Annotations 6 A.L.R.2d 812. The mere proof of misrepresentation as to a grantee is not sufficient to sustain an action for fraud. There was no evidence that Williams would not have executed the deed had he known the true identity of McKinney or that he relied upon the misrepresentation with resulting damages.
 
 
 17
 The trial judge concluded that "title to the Williams land never passed from Williams and remains today in his heirs". This conclusion is based upon a finding that the deed was never delivered to or accepted by McKinney. We think the finding and conclusion are contrary to the law and the evidence. The only evidence relating to the agreement between McKinney and Locke, representing Whitehead, is that of McKinney. Locke and Whitehead are dead. McKinney related his understanding of transactions which occurred more than twenty-six years before and of which he had no reason to recall until 1949. It seems rather clear from McKinney's testimony that he knew Whitehead was going to convey the title to some lands to him. He did not know or care what particular lands they were. He permitted it to be done strictly as a favor to Whitehead who was threatened with civil judgments. He claimed no interest in the lands. He executed the deeds in blank for the purpose of providing a means whereby Whitehead could divest title from him. He was what is commonly known as a "strawman", that is, one who holds a naked legal title to property for the benefit of another. Collins v. Curtain, 325 Mass. 123, 89 N.E.2d 211. He knew that the blank deeds to accomplish this purpose would have to be filled in at a later date, and he understood that Whitehead would use them for that purpose as he saw fit. This was satisfactory to McKinney. If McKinney's testimony is to be considered at all, it must be construed to show that he authorized Whitehead to act for him in filling in and completing the deeds to divest title from him. The delivery of the signed blank deeds could have been for no other purpose. McKinney's position was purely nominal and the deeds conveyed no real interest in the lands to him. He was in fact Whitehead, and under the circumstances, delivery and acceptance by Whitehead of the Williams deed constituted a delivery and acceptance by McKinney. A good delivery of a deed may be made to an agent or a third party on behalf of a grantee if it is made without any reservation to recall it. Arias v. Springer, 42 N.M. 350, 78 P.2d 153; 16 Am.Jur. Deeds, Sec. 127. There is no reason why delivery to the real principal should not be as effective as delivery to his agent. There is no evidence that Williams did not deliver the deed to Whitehead with intent to completely divest himself of title to the land.
 
 
 18
 Even if there were a question of delivery and acceptance by McKinney, it was cured in 1949 when he received $1,500.00 to execute a correction deed. This in itself is satisfactory evidence of a delivery of the first deed and a ratification thereof. Gould v. Day, 94 U.S. 405, 24 L.Ed. 232; Reserve Petroleum Co. v. Hodge, 147 Tex. 115, 213 S.W.2d 456, 7 A.L.R.2d 288; Annotations 7 A.L.R.2d 294.
 
 
 19
 When Whitehead obtained the Williams deed he did so as a representative of the Bates Estate. So long as the mortgage remained unpaid he held the title for the benefit of the Bates Estate, or at least subject to the lien of the mortgage. Under his arrangement with Knapp, acquiesced in by Bates' executor,[6] Union was authorized to handle the transaction as it did and when the mortgage was paid in full, title to the land vested in Union or its transferee free from any obligation of the mortgage. This would appear to explain the reason why the Williams deed was made subject to the mortgage. Williams executed the deed subject to the mortgage, thereby indicating that he knew that it was to remain of record for some reason.
 
 
 20
 Furthermore, we fail to find any equities in favor of the Williams heirs. As hereinbefore stated, their predecessor executed the deed for the purpose of conveying his property in satisfaction of an existing mortgage. Payment of a pre-existing debt is a valuable and adequate consideration for the transfer of property. Consolidated Placers, Inc., v. Grant, supra. Williams received this consideration, and everything for which he bargained. Twenty-six years later his heirs desire to keep the consideration for the bargain and seek to obtain title to the lands. Conceding that Whitehead made false representations and manipulated the title to the minerals underlying the land into his wholly owned company without cost to him, his acts do not create any equities in favor of the Williams heirs. Generally speaking, equity will not aid one who cannot establish an equity superior to that of the holder of the legal title to the subject matter, and a court of equity will not intervene where there are equal equities or where there are no equities. 30 C.J.S., Equity, § 110; Garnett v. Jenkins, 8 Pet 75, 33 U.S. 75, 8 L.Ed. 871; Taggart v. Keim, 3 Cir., 103 F.2d 194; Dunken v. Guess, 40 N.Mex. 156, 56 P.2d 1123; Monaghan v. Barnes, 48 Ariz. 213, 61 P.2d 158; Friel v. Alewel, 318 Mo. 1, 298 S.W. 762. Pacific Royalty had held legal title to the minerals in question for over twenty-six years before this action was brought. This legal title should not be disturbed by a court of equity if Williams' claim is doubtful or if the equity scale is nearly balanced. Garnett v. Jenkins, supra; Dunken v. Guess, supra; Monaghan v. Barnes, supra; Friel v. Alewel, supra. Williams received the consideration for which he bargained and his heirs should not at this late date be permitted to backtrack and set aside the conveyance. There is no indication here that the consideration was not adequate and sufficient and under the circumstances a court of equity could have required a conveyance from Williams to the proper party. In this case, that party would have been either Union Mortgage Company, Whitehead, Pacific Royalty Company or the Bates heirs. 81 C.J.S., Specific Performance, §§ 39, 62; Henry Keep Home v. Moore, 198 Okl. 198, 176 P.2d 1016; In re Gabler's Estate, 265 Wis. 31, 60 N.W.2d 342; Garsick v. Dehner, 145 Neb. 73, 15 N.W.2d 235; Bennett v. Copeland, 149 Tex. 474, 235 S.W.2d 605; Hamilton v. Harkins, 302 Ky. 340, 194 S.W.2d 646.
 
 
 21
 In denying any relief to the Bates heirs, the trial court held that the course of conduct of Union and Whitehead in handling the Bates mortgage was authorized by an arrangement with Knapp and was acquiesced in by the executor of the Bates Estate. While the court indicated in its findings that the Bates claim was stale and the plea of laches was good, it did not rely upon the finding in rendering judgment, nor did it pass upon the plea of res adjudicata. As we have heretofore stated, the evidence sustains the court's finding as to the authority of Union and Whitehead. All the evidence that is available shows that the Williams mortgage was forwarded by the Bates Estate to Knapp for servicing under the terms of a written agreement existing between them. In turn, the mortgage was forwarded to Union for servicing in accordance with an understanding between them. This servicing included the replacement of that mortgage with a new mortgage in good standing. The Bates heirs rejected an offer to substitute a mortgage in good standing for the Williams mortgage. It is impossible to ascertain with any degree of certainty the conditions upon which the mortgage was delivered to Mrs. Bates or the negotiations or understandings between Knapp and the executor bank. The files of each have been destroyed. The trust officer of the bank stated that the executor had no interest in acquiring title to any lands in New Mexico or Texas; that all it wanted was the money due upon the note and mortgage; and that Knapp and Union, including Whitehead, could handle the matter as they saw fit so long as the amount due on the mortgage, less expenses, was paid. When Union or Whitehead, obtained and delivered to the executor the amount due upon the note and mortgage, the obligation was fulfilled. Any amount, which would include title to the mineral rights, over and above this amount could be retained. It is immaterial that the title may have been held in trust by McKinney, Whitehead or Pacific Royalty or that the land was subject to the lien of the mortgage until the amount due was paid to the Bates Estate. When the amount was paid, any trust relationship which might have existed, disappeared. The findings of the trial court are fully substantiated by the evidence.
 
 
 22
 Furthermore, the judgment in the Gilmore Case was binding upon the Bates heirs. Gilmore, for a consideration of $1,000.00 obtained a deed from the Bates heirs to the legal and equitable title of "all claims, demands, rights to accounting, choses in action, equities, and causes of action of whatsoever kind and character" which the Bates heirs had in the mineral rights in question. This deed was the sole basis for the claim asserted by Gilmore in an action against Pacific Royalty. The same grounds for recovery were alleged in that action as were alleged in the instant action. In that action, Gilmore stood in the shoes of the Bates heirs. It was there adjudicated that Gilmore had no rights in the minerals and title was quieted in Pacific Royalty as against him.
 
 
 23
 Thereafter in preparation for the filing of this action, the Bates heirs obtained a reconveyance from Gilmore and his wife. The consideration was $10.00, and an additional sum of $3,000.00 if the Bates heirs made a recovery on the claim. Having conveyed all of their interest in the property to Gilmore, the Bates heirs must rely upon the reconveyance to sustain their position in this case. They are therefore privies of Gilmore and bound by the judgment in the former action. Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263; Box v. Rundell, 10 Cir., 179 F.2d 626; Clegg v. United States, 10 Cir., 112 F.2d 886; Frost v. Bankers Commercial Corp., 2 Cir., 194 F.2d 505; United States v. Willard Tablet Co., 7 Cir., 141 F.2d 141, 152 A.L.R. 1194.
 
 
 24
 There is no merit to the contention that the District Court was without jurisdiction in the Gilmore Case because of a lack of a diversity of citizenship between the parties. Diversity was alleged and the record on its face does not show a lack of diversity of citizenship between the parties. The contention of the Bates heirs amounts to a collateral attack upon the Gilmore judgment. Unless the record in that case affirmatively shows that the court did not have jurisdiction, the judgment must stand. City of New Orleans v. Fisher, 180 U.S. 185, 21 S.Ct. 347, 45 L.Ed. 485; Evers v. Watson, 156 U.S. 527, 15 S.Ct. 430, 39 L.Ed. 520; Dowell v. Applegate, 152 U.S. 327, 14 S. Ct. 611, 38 L.Ed. 463; Lacassagne v. Chapuis, 144 U.S. 119, 12 S.Ct. 659, 36 L.Ed. 368; Rubens v. Ellis, 5 Cir., 202 F.2d 415; Nye v. United States, 4 Cir., 137 F.2d 73; Connett v. City of Jerseyville, 7 Cir., 125 F.2d 121. The fact that the judgment in the Gilmore Case was entered under a stipulation of the parties is immaterial. 2 Freeman on Judgments, (5th Ed.), Sec. 757; National Rejectors, Inc., v. A. B. T. Mfg. Corp., 7 Cir., 184 F.2d 612, certiorari denied 340 U.S. 912, 71 S.Ct. 293, 95 L.Ed. 659; Tillman v. National City Bank of New York, 2 Cir., 118 F.2d 631, certiorari denied 314 U.S. 650, 62 S.Ct. 96, 86 L. Ed. 521; Pick Mfg. Co. v. General Motors Corp., 7 Cir., 80 F.2d 639. An examination of the entire record on the cross-appeal discloses no reversible errors on the part of the trial judge.
 
 
 25
 Judgment in Number 4827 is reversed with instructions to enter judgment quieting title to the mineral rights in the Pacific Royalty Company.
 
 
 26
 Judgment in the cross-appeal Number 4828 is affirmed.
 
 
 
 Notes:
 
 
 [1]
 A. W. Knapp & Co. was a trade name under which A. W. Knapp did business as a broker of first mortgages. He was a correspondent of Union Mortgage Company and brokered its loans. All defaulting mortgages were referred to Union Mortgage Co. for collection, adjustment, or for the substitution of a new mortgage in good standing. At one time, Union was handling as many as three thousand mortgages
 
 
 [2]
 Upon this subject the court made these findings:
 "That from correspondence passing between Knapp & Company and Whitehead it appears Knapp & Company wasn't adverse to Whitehead making a personal profit out of his various transactions in connection with mortgages transmitted to him by Knapp & Company.
 * * * * * *
 "From the fragments of correspondence available at this late date, there appeared clear indications that Whitehead may have been authorized to act as he did in connection with the Williams land.
 * * * * * *
 "Other indications point to the possibility that Whitehead might have had full authority to deal with the Williams loan and the Williams land as he deemed best, including the making of a personal profit for himself, provided, of course, collection of principal and interest was made for the estate. The possibility appears so evident, a finding that Whitehead and/ or Union Mortgage Company exceeded the authority granted, or defrauded, the Bates Estate cannot be made after more than twenty years delay in asserting wrongdoing.
 * * * * * *
 "There are other letters mentioning the Williams loan. While none of them may show conclusive authority in Whitehead to deal with the Williams land as he did, nevertheless they do show rather clearly that the trustees of the Bates Estate were never interested in the Williams land itself. So far as the evidence reveals, they never inquired about the land, how it was held, nor anything in connection with the real estate itself. It is evident that the trustees of the estate were interested solely in collecting the principal and interest on the loan."
 
 
 [3]
 Attached to the note given by Williams and his wife and secured by the mortgage in question were twenty interest coupons of $67.00 each. Whitehead wrote to Williams that he had in his possession the original note and mortgage and would deliver them when he got the deed, and stated that this would end Williams' liability. He also stated that the foreclosure action would be dismissed
 
 
 [4]
 Williams had died in 1929 and this letter was returned unclaimed
 
 
 [5]
 An explanation of this late filing may be that one of McKinney's blank deeds was filled in a short time before filing. The mineral deed to Pacific was signed by McKinney as a single man. Objection had been made to the deed because not signed by McKinney's wife. Whitehead had been unable to locate McKinney to obtain a correction deed. In all probability, only Whitehead knew the real facts surrounding the completion of this deed
 
 
 [6]
 There is ample evidence that Knapp agreed that Union could handle the mortgages so that it could make more than the customary fee. The trust officer of the executor bank stated that it did not desire to acquire title to any land in New Mexico and that Knapp and Union were authorized to handle the Williams mortgage as they saw fit so long as they obtained and remitted to the bank the principal and interest, less expenses. All the bank wanted was the amount due, no more, no less